## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

DARRELL TAYLOR, KEVIN
LEWIS, DARRELL BURKHART,
and LEEVERTIS PAGE,
individually and on behalf of
all others similarly situated,                              Case No.

        Plaintiffs,

v.

THE SALVATION ARMY                              **JURY TRIAL DEMANDED**
NATIONAL CORPORATION, and
THE SALVATION ARMY d/b/a
CENTRAL TERRITORIAL OF
THE SALVATION ARMY,

        Defendants.

---

## CLASS ACTION COMPLAINT

Plaintiffs Darrell Taylor, Kevin Lewis, Darrell Burkhart, and Leevertis Page ("Plaintiffs"), by and through their attorneys, Nichols Kaster, PLLP, Justice Catalyst Law, and Fish Potter Bolaños, P.C., on behalf of themselves and the Rule 23 Classes as defined below, bring this Class Action Complaint under the Federal Trafficking Victims Protection Reauthorization Act against The Salvation Army National Corporation ("SA National") and The Salvation Army, d/b/a Central Territorial of the Salvation Army ("SA Central Territory,") (collectively "The Salvation Army"). Plaintiffs seek to hold The Salvation Army accountable for profiting from labor it obtained from them and others like them by force and threats of serious harm, including with threats of incarceration, restricting workers' physical movements away from The Salvation Army, and through financial coercion and abuse.

**INTRODUCTION**

1.     Nationwide, The Salvation Army staffs its commercial thrift store operations and other business enterprises by coercing vulnerable Adult Rehabilitation Center ("ARC") program participants to perform labor under threat of serious harm, abuse of legal process, and a scheme to make participants believe they face the threat of serious harm, such as incarceration, reputational harm, and financial harm.

2.     Engaging in a long-standing abuse of the criminal justice system, The Salvation Army secures much of its labor force by soliciting referrals from courts and probation programs, thereby appropriating the coercive power of the state to force workers – who are extremely economically vulnerable – to work for the benefit of Defendants SA National and SA Central Territory.

3.     During the past 10 years, courts and other participants in the criminal justice system have ordered or diverted hundreds or thousands of people, generally with drug or alcohol use disorders, to The Salvation Army's ARC program as a condition of probation or parole and/or alternative to incarceration.

4.     There are over 100 Salvation Army ARCs throughout the United States. Every ARC requires program participants to work in The Salvation Army's commercial operations as a condition of enrollment. There are anywhere from a handful to hundreds of laborers enrolled in each ARC program at any given time.

5.     The Salvation Army holds the ARC program out as a "no-cost program[] [to] tackle the symptoms and causes of alcohol and drug dependence."[1]

---

[1] https://www.salvationarmyusa.org/usn/rehabilitation/ (last visited on November 15, 2021).

6.      Under the guise of "work therapy" which The Salvation Army asserts and advertises is a form of treatment for drug or alcohol use disorders, The Salvation Army requires its "ARC workforce" – meaning everyone enrolled in the ARC program – to labor long hours in physically demanding jobs that further The Salvation Army's commercial interests.

7.      In exchange for this work, members of the ARC workforce receive a "gratuity" of between approximately $1 and $25 per full week of work – equating to pennies an hour for their labor.

8.      The Salvation Army does not afford its ARC workforce the rights that are enjoyed by any of its other employees. The justice-referred ARC workforce does not have a choice about whether they work. They *must* report to and participate in the ARC program or they risk violating their terms of parole or probation and reincarceration.

9.      The Salvation Army's ARC workforce is not limited to justice-referred participants. The Salvation Army also solicits walk-in participants who, like the justice-referred participants, are often extremely economically vulnerable.

10.     Defendant SA Central Territory exploits these vulnerabilities to coerce walk-in participants to perform physically demanding labor, often alongside paid employees performing the same work.

11.     Forced labor is a core tenant of The Salvation Army's ARC program. It is not possible to participate in the ARC program – or benefit from the provision of housing, clothing, and food – without performing labor in The Salvation Army's commercial operations.

12.     Defendant SA Central Territory ensures its ARC workforce continues providing labor by threatening serious harm to them should they stop working.

3

13.     For example, Defendant SA Central Territory threatens to report justice-referred participants for violations of their terms of probation or parole ("conditions") if the justice-referred participant fails to complete their required labor in the time and manner dictated by Defendant SA Central Territory. Specifically, Defendant SA Central Territory threatens to contact participants' parole or probation officers, or even the sentencing court, to report a violation.

14.     Defendant SA Central Territory knows that such a report could result in the worker being incarcerated or otherwise punished by the justice system for allegedly violating their conditions of probation or parole.

15.     The Salvation Army engages in a scheme, plan, or pattern intended to cause its ARC workforce, justice-referred and walk-in participants alike, to believe that, if they do not perform the required labor, they will suffer serious harm that may include but is not limited to, financial instability, food insecurity, homelessness, and the inability to obtain paid work.

16.     For example, The Salvation Army ensures that its ARC workforce will continue providing forced labor through sustained and targeted financial coercion. The Salvation Army's ARC program is designed to make participants fully reliant on the program for food, clothing, and housing.

17.      The Salvation Army generally requires the ARC workforce to live on site, severely restricts their contact with anyone outside of The Salvation Army for the first month to six weeks at the ARC, and limits their ability to work outside paid jobs. The Salvation Army requires many participants to assign and/or sign over their food and other governmental support benefits and/or vouchers, forfeiting their right to decide how to spend them.

18.     By paying participants pennies an hour for their labor and monopolizing their time, The Salvation Army ensures that participants must work for months before they can save enough

4

money from "gratuities" to provide for their most basic needs for even a few days outside of The Salvation Army's ARC program.

19.     Similarly, The Salvation Army also ensures that its ARC workforce will continue providing forced labor through sustained and targeted psychological coercion and threats of serious harm.

20.     The Salvation Army is clear about the terms of the exchange the ARC workforce must make: if they want a bed in an ARC facility, they must work full-time for effectively zero wages in The Salvation Army's commercial stores and warehouses, in physically demanding and often dangerous jobs.

21.     The Salvation Army therefore engages in a scheme, plan, or pattern intended to cause its workers to believe that, if they do not perform the required labor, they will suffer serious harm including but not limited to financial instability, food insecurity, homelessness, and inability to obtain paid work.

22.     Further, Defendant SA Central Territory abuses the criminal justice system by acquiring a steady stream of forced laborers from court and probation referrals and exploiting ARC workers' strict probation or parole conditions to obtain forced labor under the guise of "work therapy."

23.     Through these unlawful acts, The Salvation Army violates the Trafficking Victims Protection Reauthorization Act as outlined in detail below.

## JURISDICTION AND VENUE

24.     This Court has original jurisdiction to hear this Complaint and to adjudicate the claims stated herein pursuant to 28 U.S.C. § 1331 because this action asserts claims arising under

federal law, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589 et seq.

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

26.    Defendant The Salvation Army National Corporation ("SA National") is a New Jersey corporation headquartered in Virginia and doing business throughout the United States, including in Illinois and in this district.

27.    Defendant The Salvation Army d/b/a Central Territorial of the Salvation Army ("SA Central Territory") is incorporated in Illinois and operates throughout the central United States, including in Illinois.

28.    Plaintiff Darrell Taylor is an adult resident of Illinois.

29.    Plaintiff Kevin Lewis is an adult resident of Illinois.

30.    Plaintiff Darrell Burkhart is an adult resident of Michigan.

31.    Plaintiff Leevertis Page is an adult resident of Florida.

## FACTUAL ALLEGATIONS

32.    Plaintiffs re-allege and incorporate by reference the above paragraphs as if fully set forth herein.

### The Salvation Army's Organizational Structure

33.    The Salvation Army in the United States is a multi-billion-dollar business organized like a military army.

34.    The leaders at the top of the organization are called "Commanders." Below Commanders are Officers—both Cadets, who are officers-in-training, and full rank officers

(Lieutenant, Captain, Major, Lieutenant Colonel, Colonel, Commissioner). Local adherents who give allegiance to the doctrines and disciplines of The Salvation Army are called Soldiers.

35.     The Salvation Army in the United States is divided into four territories: Eastern, Central, Southern, and Western ("the Territories" or "Salvation Army Territories"). Each Territory is led by a Territorial Commander.

36.     Above the four Territorial Commanders sits the National Commander, the leader of all Salvation Army activities in the United States.

37.     According to The Salvation Army:

The National Commander serves as the official leader of The Salvation Army at National Headquarters in Alexandria, Virginia. National Headquarters acts primarily as a coordinating body for Salvation Army resources from the corps level on up.[2]

38.     Each of the Salvation Army Territories, including Defendant SA Central Territory, operate at the direction of Defendant SA National, subject to Defendant SA National's broad directives, and according to national policies established by Defendant SA National.

39.     Defendant SA Central Territory carries out the work of The Salvation Army in the following 11 states: Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, South Dakota, and Wisconsin.

40.     The Eastern, Western, and Southern Territories ("the other Territories") carry out the work of The Salvation Army in the remaining 46 states, regions, and territories: Connecticut, Delaware, Northeast Kentucky, Maine, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, Puerto Rico, Virgin Islands, Alaska, Washington,

---

[2] https://s3.amazonaws.com/usn-cache.salvationarmy.org/25328cb3-2dd5-477c-a150-5bdfe657a0da_Fact_Sheet_-_Salvation_Army_Organization_and_Structure.pdf (last visited on November 13, 2021).

Oregon, California, New Mexico, Arizona, Nevada, Utah, Idaho, Wyoming, Montana, Colorado, Hawaii, Guam, Micronesia, Marshall Islands, Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, Washington, D.C., and West Virginia.

41.     Defendant SA National dictates national policy for all Salvation Army Territories.

42.     Defendant SA National dictates national policy through, among other means, the Commissioners' Conference.

43.     The Commissioners' Conference is a board that serves as the policy-making body of The Salvation Army in the United States.

44.     The National Commander of Defendant SA National presides over the Commissioners' Conference.

45.     Territorial Commanders from each of the four Salvation Army Territories also serve on the Commissioners' Conference and participate in national policy-making.

46.     All Territories, including Defendant SA Central Territory, operate under the same broad, overall policies, including those dictated by the Commissioners' Conference under the leadership of the National Commander.

47.     There is an agreement by and between Defendants SA National and SA Central Territory that Defendant SA Central Territory will operate under The Salvation Army's policies and procedures, including those implemented by Defendant SA National, and will carry out The Salvation Army's programs within the Central Territory.

48.     There is also an agreement by and between Defendant SA National and each of the other Territories that each Territory will operate under The Salvation Army's policies and

8

procedures, including those implemented by Defendant SA National, and will carry out The Salvation Army's programs within its respective territory.

49.     The purpose and effect of these agreements is for The Salvation Army to operate as a single, unified, and integrated enterprise throughout the United States.

50.     Kenneth Hodder is the current National Commander of The Salvation Army.

51.     When Commander Hodder accepted his commission, The Salvation Army announced that he would "lead the largest social services organization in the United States, with more than 7,600 centers of operations across the country that together serve 23 million people each year."[3]

52.     David Hudson is the recently-retired National Commander of The Salvation Army.

53.     When he accepted his post as National Commander in 2017, Hudson said he was "honored and privileged to lead The Salvation Army's efforts to help Americans facing a variety of needs, from drug and alcohol rehabilitation to rent and utility assistance to disaster response . . . ."[4]

54.     In his role as National Commander, Hudson led "a network of 3,559 officers, 65,469 employees and 3.2 million volunteers serving in more than 7,500 centers of operation throughout the United States."[5]

---

[3] *See* https://www.salvationarmyusa.org/usn/story/commissioners-kenneth-and-jolene-hodder-begin-tenure-as-leaders-of-the-salvation-army/ (last visited August 26, 2021).
[4] *See* https://www.salvationarmyusa.org/usn/news/the-salvation-army-appoints-new-national-leaders/ (last visited August 26, 2021).
[5] *Id.*

## **Defendant SA National's Contacts with Illinois**

55.     William Roberts, the National Commander before Hudson, was installed as "USA National Leader" in a ceremony at The Salvation Army's Mayfair Community in Chicago, Illinois.[6]

56.     In 2020, Defendant SA National, through the Salvation Army National Advisory Board, planned and scheduled a four-day long National Advisory Organizations Conference to be held in Chicago, Illinois.[7]

57.     The Salvation Army National Advisory Board is

[a]n organization consisting of prominent leaders from across the country that assists with strategic planning, advocacy, networking, brand positioning, visibility, and high level fund raising for The Salvation Army for issues of significant national interest. It sets the standard for the Army in these areas to advance the ministry of the Army, under the guidance of The Salvation Army National Corporation and the Commissioners' Conference.[8]

58.     Although the National Advisory Organizations Conference was cancelled because of the ongoing Covid-19 pandemic, Defendant SA National, by and through the National Advisory Board, promulgated a Best Practices handbook for the conference.[9]

59.     The handbook contains "best practices" for The Salvation Army's ARCs.[10]

60.     Defendant SA National advertises The Salvation Army's nationwide programs and services for the purpose of obtaining donations and soliciting ARC participants.

---

[6] *See* https://www.salvationarmy.org/ihq/news/9526CFF0A589BD64802577E0004AB49F (last visited October 25, 2021).
[7] *See* https://westernusa.salvationarmy.org/advisory_board_west/national-advisory-organizations-conference-2020/ (last visited November 4, 2021).
[8] https://s3.amazonaws.com/usn-cache.salvationarmy.org/070eacd0-ece0-4887-bcc5-fdbe9ae2ec25_Advisory-Board-Manual.pdf, at 36 (last visited November 4, 2021).
[9] *See* https://tsabestpractices.org/document.pdf (last visited November 4, 2021).
[10] *Id*. at 7-11.

61.     Defendant SA National advertises using the website www.salvationarmyusa.org. That website is interactive and can be specifically directed at users in particular locations around the country, including in Illinois.

62.     For example, users in Illinois can submit donations from this website that will be specifically routed to Illinois by using the "Donate Locally" feature.

63.     Users in the other Territories can similarly submit donations from this website that will be specifically routed to their particular state by using the "Donate Locally" feature.

64.     Defendant SA National does not redirect Illinois users to Defendant SA Central Territory's website for the purpose of making local (Illinois) donations.

65.     The same is true of users in states within the other Territories.

66.     Defendant SA National also solicits the collection of physical donations (clothes, furniture, and other goods) and cash donations specifically earmarked for use in Salvation Army programs in Illinois, including Illinois ARCs, rather than referring those collections to the Central Territory or an Illinois division.

67.     If users in Illinois wish to arrange a donation to an ARC in Illinois, including physical donations that would be picked up by the local ARC workforce, they can do so through Defendant SA National's centralized donation websites, https://www.salvationarmyusa.org/usn/, and https://satruck.org/.[11]

_____

[11] At the top right corner, select red button labeled "donate locally." A drop-down donation page will appear. On the left-hand side, under "Donate Goods," a visitor to SA National's page can enter any zip code and click "Go." This directs the visitor to a centralized goods donation platform e.g., https://satruck.org/Donate/Choose?zip=%2060604 (Chicago, 60604), where Salvation Army allows the visitor to select what they want to donate and shows Salvation Army's availability for pick-ups and drop offs. Pick-up availability varies based on the zip code the visitor enters. Similarly, if instead of "Donate Goods" the visitor selects "Give Now," Salvation Army allows the visitor to make a monetary donation earmarked for any city in the country, e.g.,

68.     Defendant SA National engages in extensive advertising regarding its ARCs nationwide, including in Illinois.

69.     For example, Defendant SA National advertises the ARC program to donors and participants in Illinois including, upon information and belief, through print, television, and internet advertisements, including the website www.salvationarmy.org.

70.     Defendant SA National admits that it collects the "locations of devices used to access [its] website."[12]

71.     Defendant SA National does this, in part, "[t]o provide, operate, maintain, improve, personalize, and promote [its] services, and donor and volunteer opportunities and activities" and "[t]o solicit volunteer, financial, and other support for [its] mission."[13]

**Defendants' Adult Rehabilitation Center Program**

72.     Defendants SA National and SA Central Territory own, lease, lease to, or operate Adult Rehabilitation Centers, referred to as ARCs, throughout the Central Territory, including in Waukegan, Illinois; Chicago, Illinois; and Detroit, Michigan.

73.     The Salvation Army's other Territories also own, lease, lease to, or operate ARCs within the 46 states, regions, and territories in their purview.

74.     The ARC program has operated for over 100 years.

75.     During the 180-day ARC program, participants are required to rely on The Salvation Army for food, clothing, and shelter.

---

https://give.salvationarmyusa.org/give/164006/#!/donation/checkout?amount=Other (last visited November 15, 2021).

[12] *See* https://www.salvationarmyusa.org/usn/privacypolicy/ (last visited November 9, 2021).

[13] *See Id*.

76.     Defendants SA National and SA Central Territory own, lease, lease to, or operate thrift stores throughout the Central Territory, including in Waukegan, Illinois; Chicago, Illinois; and Detroit, Michigan.

77.     The Salvation Army's other Territories also own, lease, lease to, or operate thrift stores within the 46 states, regions, and territories in their purview.

78.     The Territories, including Defendant SA Central Territory, each operate ARC programs and thrift stores according to the same framework and broad policies and procedures.

79.     Defendants' ARC programs operate in conjunction with their thrift stores.

80.     Defendant SA Central Territory staffs its thrift store operations, in part, with forced laborers Defendants recruit into the ARC program ("ARC workforce").

81.     Defendant SA Central Territory requires that its ARC workforce perform this labor under the guise of "work therapy."

82.     Defendant SA Central Territory does not add its ARC workforce to its payroll.

83.     "Work therapy" is not a legal term of art or exception to the TVPRA.

84.     In this case, it is simply a description of forced labor performed by individuals who are enrolled in a Salvation Army ARC program operated by any Territory, including Defendant SA Central Territory.

85.     Defendant SA National, in collaboration with four Territories through the Commissioners' Conference, designed the structure, framework, and basic requirements of The Salvation Army's "work therapy" and ARC programs.

86.     Defendant SA Central Territory executes these programs at the local level within its territory at the direction of Defendant SA National and within the framework of Defendant SA National's broad policies and procedures.

87.    The other Territories each execute these programs at the local level within their territories at the direction of Defendant SA National and within the framework of Defendant SA National's broad policies and procedures.

88.    There is an agreement between Defendant SA National and the Territories, including Defendant SA Central Territory, that each will operate the ARC programs in its region under the structure, framework, and basic requirements that Defendant SA National has established.

89.    The purpose and effect of this agreement is that the structure, framework, and basic requirements of the ARC programs is the same throughout each Territory, including Defendant SA Central Territory.

90.    Defendants' "work therapy" program, and those run by each of the other Territories, requires that members of the ARC workforce work at least 8 hours per day, and at least 40 hours per week.

91.    Upon information and belief, this policy emanates from Defendant SA National and is executed at the local level by each Territory, including Defendant SA Central Territory.

92.    National Salvation Army policy, dictated by Defendant SA National, provides that "work therapy" includes the collection and repair of donations-in-kind and the operation of Salvation Army thrift stores.[14]

93.    A fundamental tenet of the ARC program is that if you do not work, you may not remain in the ARC facility.

---

[14] *See* http://usawest.us/ad-board-downloads/08-definitive-statement.pdf (last visited August 30, 2021).

94. Upon information and belief, this policy emanates from Defendant SA National and is executed at the local level by each Territory, including Defendant SA Central Territory

95. Upon information and belief, the exclusion of the ARC workforce from payroll is a national policy emanating from Defendant SA National and executed at the local level by each Territory, including Defendant SA Central Territory.

96. Instead of paying regular wages to members of the ARC workforce, each Territory, including Defendant SA Central Territory, provides for payment of small weekly "gratuities" in exchange for the work performed.

97. The "gratuity" ranges from approximately $1 to $25 per full week of work, which amounts to between $0.02 and $0.62 per hour.

98. Each Territory, including Defendant SA Central Territory, requires members of the ARC workforce to perform strenuous, often dangerous labor, including in its warehouses, kitchens, stores, and on its donation collection trucks.

99. Each Territory, including Defendant SA Central Territory, requires members of the ARC workforce to perform this work regardless of their health status.

100. Defendant SA Central Territory benefits, in part, from the labor performed by members of the ARC workforce because it reduces Defendant SA Central Territory's payroll.

101. In addition to requiring long hours of forced labor, each Territory, including, Defendant SA Central Territory, often requires that members of the ARC workforce assign their rights and/or sign over their governmental support benefits and/or vouchers, including Supplemental Nutritional Assistance Program (SNAP) and social security disability benefits, to The Salvation Army and forfeit any discretion over how they are spent.

102.     These governmental support benefits and/or vouchers often amount to hundreds of dollars per month, greatly exceeding the "gratuity" the ARC workforce receives each week.

103.     Upon information and belief, each Territory, including Defendant SA Central Territory, monetizes these governmental support benefits and/or vouchers for its own purposes.

104.     The assignment of governmental support benefits and/or vouchers to The Salvation Army directly impedes the ARC workforce's ability to flee The Salvation Army's ARC facilities – thereby increasing the coercion that renders their labor unlawfully forced.

105.     The extreme imbalance of power between members of the ARC workforce and The Salvation Army is fundamental to the structure of the program.

106.     Defendants, and the other Territories, target and recruit marginalized individuals.

107.     Defendants, and the other Territories, primarily recruit people who: have substance use disorders; are unhoused; are food-insecure; are experiencing poverty; are involved in the justice system; or some combination of all the above.

108.     Thus, while the Territories, including Defendant SA Central Territory, can count on a steady stream of new and capable ARC workers—either diverted from the justice system or left with nowhere else to go because of poverty or other marginalizing conditions—the vast majority of the ARC workforce is fully reliant on the ARC program for food, clothing, and housing.

109.     These conditions, which the Territories, including Defendant SA Central Territory, exploit and perpetuate, compel members of the ARC workforce to perform or to continue performing labor to avoid losing access to the basic necessities of life that are held for ransom.

110.     Because it is Defendants' policy to pay the ARC workforce almost nothing for their work, the ARC workforce is unable to accrue meaningful savings that would allow them to survive

without the food, clothing, and housing the Territories, including Defendant SA Central Territory, provide.

111.    A large proportion of Defendant SA Central Territory's ARC workforce was referred to Defendants by court order or as a condition of probation or parole.

112.    This is also true of the ARC workforces in the other Territories.

113.    Justice-referred members of the ARC workforce are generally required to complete The Salvation Army's 180-day rehabilitation program to satisfy the conditions of release.

114.    Failure to complete the program – including if Defendant SA Central Territory expels a member of the ARC workforce from the program for any reason, including refusing to work – may result in incarceration, often for a period longer than 180 days.

115.    This is also true of the ARC workforces in the other Territories

116.    As the authors of the ARC program, Defendants, and the other Territories, determine the terms and conditions of the program.

117.    This means Defendants, and the other Territories, determine the requirements for members of the justice-referred ARC workforce to successfully complete the program.

118.    Members of the justice-referred ARC workforce are not incarcerated while laboring for Defendant SA Central Territory or the other Territories.

119.    Defendants, and the other Territories, know that members of the ARC workforce will be fully reliant on the ARC program for food, clothing, and housing, and have designed the ARC program with the intent to put the ARC workforce in a position of such reliance.

120.    Participants entering the ARC program immediately forfeit their personal items including clothing, jewelry, cell phones, electronics, and many prescribed medications to Defendant SA Central Territory.

121.    This is also true of the ARC programs in the other Territories.

122.    Many members of the ARC workforce are required to assign their rights and/or sign over their governmental support benefits and/or vouchers, including Supplemental Nutritional Assistance Program (SNAP) and social security disability benefits, to The Salvation Army and are prevented from accessing their own EBT cards or determine how the funds are used.[15]

123.    The Territories, including Defendant SA Central Territory, cut the ARC workforce off from the outside world for approximately thirty days after arrival at the ARC by, among other things, restricting movement and communication outside the ARC or thrift stores, and by restricting or prohibiting access to and contact with outside medical care, family, friends, and/or other visitors.

124.    Upon information and belief, the Territories, including Defendant SA Central Territory did so in compliance with a nationwide policy promulgated and instituted by Defendant SA National.

125.    The Territories, including Defendant SA Central Territory, then obtain forced labor by threatening to strip the ARC workforce of the food (donated by members of the public or purchased with the ARC workforce's forfeited governmental support benefits and/or vouchers), clothing (donated by members of the public), and housing they have provided if participants do not perform the required labor.

126.    Defendants designed the ARC program to target individuals who are experiencing poverty, are unhoused, and/or are experiencing food insecurity, making them more susceptible to performing forced labor in exchange for basic shelter and sustenance.

---

[15] "EBT" or "Electronic Benefits Transfer" cards work like credit or debit cards for government assistance payments including SNAP.

127.    Employees of Defendant SA Central Territory routinely threaten members of the justice-referred ARC workforce if they do not perform required work or work too slowly or below Defendant SA Central Territory's standards.

128.    This is also true of the justice-referred ARC workforces in the other Territories.

129.    These threats include submitting negative probation reports, calling a participant's probation or parole officer directly to report "misbehavior," calling the police on a participant, and simply kicking the participant out of the ARC, causing the participant to violate the terms of their probation or parole.

130.    Because Defendants designed the ARC program, and Defendant SA Central Territory determines whether a given participant successfully completes the program, Defendant SA Central Territory has substantial control over whether members of the justice-referred ARC workforce become incarcerated and/or face other justice system consequences.

131.    This is also true of the other Territories.

132.    The Territories, including Defendant SA Central Territory, use the same threats to obtain or coerce labor from members of the walk-in ARC workforce who are on parole or probation but are not required to participate in an ARC program as a stated condition of their parole or probation.

133.    Defendants, and the other Territories, intend the "work therapy" component of the ARC program to cause the ARC workforce to believe and fear that they will lose the food and housing on which they rely if they do not continue to perform the required work.

134.    Defendants, and the other Territories, designed the justice-referral aspect of their ARC program to cause members of the justice-referred ARC workforce to believe they will be incarcerated or face other justice system consequences if they do not perform the required labor.

19

135.    Defendants rely on justice system referrals for a significant portion of the ARC workforce.

136.    The same is also true of the other Territories.

137.    Defendant SA National's advertising is directed, in part, at securing forced labor.

138.    Defendant SA Central Territory also advertises the ARC program within the Central Territory, directed, in part, at securing forced labor.

139.    Defendant SA Central Territory benefits from justice system referrals because such referrals reduce the number of employees Defendants must recruit from other sources.

140.    Defendant SA Central Territory also benefits from justice system referrals because Defendant SA Central Territory does not pay market rate wages to these employees.

141.    Defendant SA Central Territory benefits from the labor performed by the ARC workforce because Defendant SA Central Territory does not place its ARC workforce on its payroll, and therefore does not pay or submit any form of state or federal payroll taxes for its ARC workforce.

142.    The labor performed by the ARC workforce reduces Defendant SA Central Territory's payroll and tax obligations and allows Defendant SA Central Territory to repurpose funds that would otherwise be used to pay employees to perform these tasks.

143.    There is often stigma associated with justice involvement.  People who are involved in the justice system often have limited access to resources and advocacy.

144.    Defendant SA Central Territory further benefits from justice system referrals because the justice-referred laborers have limited access to resources and advocacy which decreases the likelihood that the ARC workforce will refuse to work, demand legal pay, or be able to obtain access to justice to challenge the conditions of their servitude.

20

145. Defendant SA National derives significant name-recognition benefit from services and operations performed within each of its Territories, including the Central Territory, because Defendant SA National advertises The Salvation Army's services at the national level, without distinguishing among services performed in various Territories.

146. Defendant SA National relies on its name-recognition to obtain significant donations, gifts, and other support.

### **Plaintiffs' Forced Labor in Defendants' ARC Program**

***Darrell Taylor***

147. Plaintiff Darrell Taylor ("Taylor") was a justice-referred participant in The Salvation Army's ARC program in Chicago, Illinois from approximately January 2017 until May 2017.

148. Taylor is a class representative for the Nationwide Justice-Referred Class and the SA Central Territory Justice-Referred Class, as defined below.

149. Taylor was charged with a crime in 2015 in Cook County, Illinois and received a 3-year sentence. Taylor was incarcerated for the first 18 months of the sentence.

150. Taylor was granted parole after 18 months and sent to an SA Central Territory ARC because there were no other options that met the terms of his parole.

151. Taylor was required to stay at the ARC for one year as a condition of his parole.

152. Upon his arrival at the ARC, SA Central Territory employees required Taylor to turn over his EBT card with his SNAP benefits as a condition of his participation in the ARC program.

153. Taylor's time at the ARC began with a blackout period, during which he could not leave the ARC and his contact with the outside world was limited.

154. SA Central Territory required Taylor to perform strenuous work during his time at the ARC.

155. Taylor worked on the docks at Salvation Army thrift stores. His work involved loading and unloading trucks of donated items to be sold in the thrift stores.

156. At the direction of SA Central Territory employees, Taylor also went to private homes to pick up donations for the Salvation Army thrift store.

157. Upon information and belief, an SA Central Territory employee drove Taylor to the private homes in a truck owned or operated by SA Central Territory.

158. Taylor worked with an SA Central Territory employee to haul donations out of the private homes and into the truck.

159. An SA Central Territory employee then delivered those donations to Salvation Army thrift store warehouses and stockrooms. The donations were later sold as merchandise in Salvation Army thrift stores.

160. On one occasion, uniformed Salvation Army personnel visited and inspected the thrift stores where Taylor worked.

161. Taylor worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

162. In exchange for his labor, SA Central Territory gave Taylor a small amount of cash, which employees of SA Central Territory referred to as a "gratuity."

163. SA Central Territory gave Taylor a "gratuity" of between approximately $5 and $23 per week.

164. SA Central Territory used Taylor's status as a justice-referred participant as a threat to obtain labor.

22

165. SA Central Territory employees knew that Taylor was on parole because his parole officer visited the ARC monthly and SA Central Territory staff communicated with the parole officer directly.

166. SA Central Territory employees knew that leaving the ARC program was a parole violation.

167. SA Central Territory employees told Taylor that if he did not work, he had to leave the ARC.

168. SA Central Territory employees used the threat of a parole violation and incarceration to obtain labor from Taylor.

169. SA Central Territory employees knew that their complaints to Taylor's parole officer could result in a parole violation.

170. SA Central Territory employees threatened to call Taylor's parole officer if he worked too slowly.

171. SA Central Territory employees told Taylor and other justice-referred participants that they would go to jail if they did not follow work instructions.

172. Taylor saw other justice-referred participants sent to jail for not following SA Central Territory's work instructions.

*Kevin Lewis*

173. Plaintiff Kevin Lewis ("Lewis") was a walk-in participant in The Salvation Army's ARC program in Waukegan, Illinois and Chicago, Illinois in 2015 and 2019, respectively.

174. Lewis is a class representative for the Nationwide Walk-In Class and the SA Central Territory Walk-In Class, as defined below.

175.    Upon his arrival at the ARC, SA Central Territory employees required Lewis to turn over his EBT card with his SNAP benefits as a condition of his participation in the ARC program.

176.    SA Central Territory required Lewis to work in Salvation Army thrift store stockrooms during his time at the ARC.

177.    Lewis performed janitorial work in the thrift store stockrooms.

178.    Lewis also sorted, hung, and prepared donated clothing.

179.    The clothing Lewis prepared was later sold in the Salvation Army thrift store as merchandise.

180.    At the direction of SA Central Territory employees, Lewis also went to private homes to pick up donations for the Salvation Army thrift store.

181.    Upon information and belief, an SA Central Territory employee drove Lewis to the private homes in a truck owned or operated by SA Central Territory.

182.    Lewis worked with an SA Central Territory employee to haul donations out of the private homes and into the truck.

183.    An SA Central Territory employee then delivered those donations to Salvation Army thrift store warehouses and stockrooms. The donations were later sold as merchandise in Salvation Army thrift stores.

184.    Lewis worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

185.    SA Central Territory required Lewis to work at least 40 hours per week to have access to food and shelter.

186. SA Central Territory employees required Lewis to perform additional labor if Lewis violated SA Central Territory's rules.

187. In exchange for his labor, SA Central Territory gave Lewis a small amount of cash each week, which SA Central Territory employees referred to as a "gratuity."

188. SA Central Territory gave Lewis a "gratuity" of between approximately $7 and $25 per week.

189. SA Central Territory restricted, and threatened to restrict, Lewis's access to food outside of the ARC.

190. SA Central Territory ensured that Lewis could not build his savings and achieve financial independence by imposing strict requirements on Lewis's time and sharply limiting his freedom of movement and communication.

191. Through the design, policies, and procedures of the ARC program, SA Central Territory intentionally cultivated Lewis's reliance on the ARC for necessities, including food and shelter.

192. SA Central Territory employees told Lewis and other walk-in participants that they would lose their access to food and shelter if they did not follow work instructions.

193. Lewis saw other walk-in participants lose their access to food and shelter for not following SA Central Territory's work instructions.

194. By these communications and actions, and by the structure, policies, and procedures of the ARC program, SA Central Territory leveraged Lewis's reliance and vulnerability as part of a scheme to obtain Lewis's labor.

195.    By these communications and actions, and by the structure, policies, and procedures of the ARC program, SA Central Territory threatened Lewis's access to food and housing to obtain labor.

***Darrell Burkhart***

196.    Plaintiff Darrell Burkhart ("Burkhart") was a justice-referred participant in The Salvation Army's ARC program in Detroit, Michigan in 2016 and/or 2017.

197.    Burkhart is a class representative for the SA Central Territory Justice-Referred Class, as defined below.

198.    Burkhart was charged with a crime in 2017 and sentenced to 12 months in prison.

199.    After serving 9 months of his sentence in prison, Burkhart was released to the ARC program.

200.    Burkhart was told he had to stay at the ARC for 12 months.

201.    Burkhart understood that he would violate his conditions of release, and risk reincarceration, if he left the ARC at any time before the end of the 12-month period.

202.    SA Central Territory employees picked Burkhart up from lockup and drove him to the ARC.

203.    Upon his arrival at the ARC, SA Central Territory employees required Burkhart to turn over his EBT card with his SNAP benefits as a condition of his participation in the ARC program.

204.    Burkhart's time at the ARC began with a blackout period, during which he could not use the phone and his contact with the outside world was limited.

205.    SA Central Territory required that Burkhart perform strenuous work at multiple Salvation Army thrift stores during his time at the ARC.

206.     Burkhart's work included unloading thrift store donations from vehicles and hauling the donations into the thrift store to be sold as merchandise. After customers purchased merchandise from the thrift store, Burkhart carried it out to their vehicles.

207.     Burkhart stocked thrift store shelves with donations that SA Central Territory then sold as merchandise. He also cleaned and maintained thrift stores.

208.     Burkhart worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

209.     In exchange for his labor, SA Central Territory gave Burkhart a small amount of cash each week, which employees of SA Central Territory referred to as a "gratuity."

210.     SA Central Territory gave Burkhart a "gratuity" of between approximately $2 and $7 per week.

211.     SA Central Territory used Burkhart's status as a justice-referred participant as a threat to obtain labor.

212.     SA Central Territory employees were in regular contact with Burkhart's probation officer, reporting on his behavior and work ethic.

213.     SA Central Territory employees told Burkhart they would report him to his probation officer if he was not working hard or fast enough.

214.     SA Central Territory employees told Burkhart and other justice-referred participants that they would go to jail if they did not follow work instructions.

215.     When Burkhart felt ill, SA Central Territory threatened to call Burkhart's probation officer and have a warrant put out for his arrest unless he worked as instructed by SA Central Territory employees.

216.     Burkhart saw other justice-referred participants sent to jail for not following SA Central Territory's work instructions.

217.     Burkhart left the ARC after approximately four or five weeks because he could not take the grueling, forced labor any longer, which was coerced under the threat of serious harm.

218.     SA Central Territory employees called Burkhart's probation officer hours after he left the ARC and Burkhart was taken to jail.

*Leevertis Page*

219.     Plaintiff Leevertis Page ("Page") was a walk-in participant in The Salvation Army's ARC program in Detroit, Michigan in 2017.

220.     Page is a class representative for the SA Central Territory Walk-In Class, as defined below.

221.     Upon his arrival at the ARC, SA Central Territory employees required Page to turn over his EBT card with his SNAP benefits as a condition of his participation in the ARC program.

222.     Page's time at the ARC began with a blackout period, during which he could not use the phone and his contact with the outside world was limited.

223.     SA Central Territory required Page to work in the ARC kitchen during his time at the ARC.

224.     Page's work included cooking food for ARC residents and SA Central Territory employees, and/or cleaning up the kitchen including washing dishes, bussing tables, and emptying the trash.

225.     At the direction of SA Central Territory employees, Page catered private events including weddings, funerals, and parties.

226.    Upon information and belief, SA Central Territory charged approximately $30 to $40 per plate at the events Page catered.

227.    SA Central Territory also required Page to perform strenuous work on the docks of a Salvation Army thrift store warehouse during his time at the ARC.

228.    Page's dock work consisted of loading and unloading trucks filled with donations that SA Central Territory would sell in the thrift store as merchandise.

229.    Page worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

230.    SA Central Territory employees required Page to perform additional labor if Page violated SA Central Territory's rules.

231.    In exchange for his labor, SA Central Territory gave Page a small amount of cash each week, which SA Central Territory employees referred to as a "gratuity."

232.    SA Central Territory gave Page a "gratuity" of between approximately $1 and $20 per week.

233.    SA Central Territory paid Page so little that he could not build up the savings required to achieve stability elsewhere.

234.    SA Central Territory took Page's EBT card and returned it with a $0 balance when he left the ARC.

235.    SA Central Territory restricted, and threatened to restrict, Page's access to food outside of the ARC.

236.    SA Central Territory required Page to work at least 40 hours per week to have access to food and shelter.

237.    For at least his first 30 days at the ARC, SA Central Territory prevented Page from leaving the ARC except to work in SA Central Territory facilities.

238.    SA Central Territory also forbid Page from using a telephone during that time.

239.    SA Central Territory ensured that Page could not build his savings and achieve financial independence by imposing strict requirements on Page's time and sharply limiting his freedom of movement and communication.

240.    Through the design, policies, and procedures of the ARC program, SA Central Territory intentionally cultivated Page's reliance on the ARC for necessities, including food and shelter.

241.    SA Central Territory employees told Page and other walk-in participants that they would lose their access to food and shelter if they did not follow work instructions.

242.    Page saw other walk-in participants lose their access to food and shelter for not following SA Central Territory's work instructions.

243.    Page saw other participants kicked out of the ARC program during wintery conditions and in the middle of the night for not following SA Central Territory's instructions.

244.    By these communications and actions, and by the structure, policies, and procedures of the ARC program, SA Central Territory leveraged Page's reliance and vulnerability as part of a scheme to obtain Page's labor.

245.    By these communications and actions, and by the structure, policies, and procedures of the ARC program, SA Central Territory threatened Page's access to food and housing to obtain labor.

## CLASS ACTION ALLEGATIONS

246.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure.

247.     Plaintiff Lewis asserts his Trafficking Victims Protection Reauthorization Act

claims against SA National on behalf of a Nationwide Walk-In Class defined as follows:

> All walk-in participants who performed labor while participating in The Salvation
> Army's Adult Rehabilitation Center Program in the United States within the 10
> years prior to the filing of this action, excluding participants who labored in ARC
> programs located in California and the Plaintiffs in *Tolbert, et al. v. The Salvation
> Army, a Georgia Corporation* (N.D. Ga. filed Nov. 15, 2021). "Walk-in"
> participant means anyone who attended an ARC without a court, probation, or
> parole order or condition requiring them to do so.

248.     Plaintiff Taylor asserts his Trafficking Victims Protection Reauthorization Act

claims against SA National on behalf of a Nationwide Justice-Referred Class defined as follows:

> All justice-referred participants who performed labor while participating in The
> Salvation Army's Adult Rehabilitation Center Program in the United States within
> the 10 years prior to the filing of this action, excluding participants who labored in
> ARC programs located in California and the Plaintiffs in *Tolbert, et al. v. The
> Salvation Army, a Georgia Corporation* (N.D. Ga. filed Nov. 15, 2021). "Justice-
> referred" participant means anyone who attended an ARC pursuant to a court,
> probation, or parole order or condition requiring them to do so.

249.     The Nationwide Walk-In Class and the Nationwide Justice-Referred Class are

referred to collectively in this complaint as the "Nationwide Classes."

250.     Plaintiffs Lewis and Page bring their Trafficking Victims Protection

Reauthorization Act claims against SA Central Territory on behalf of the following Central

Territory Walk-In Class:

> All walk-in participants who performed labor in The Salvation Army's Adult
> Rehabilitation Center Program in The Salvation Army's Central Territory within
> the 10 years prior to the filing of this action. "Walk-in" participant means anyone
> who attended an ARC without a court, probation, or parole order or condition
> requiring them to do so. "Central Territory" includes any location under the control

of The Salvation Army, d/b/a Central Territorial of the Salvation Army (and any predecessor corporation) in the 10 years prior to the filing of this action.

251. Plaintiffs Taylor and Burkhart assert their Trafficking Victims Protection Reauthorization Act claims against SA Central Territory on behalf of a Central Territory Justice-Referred Class defined as follows:

> All justice-referred individuals who performed labor while participating in The Salvation Army's Adult Rehabilitation Center Program in The Salvation Army's Central Territory within the 10 years prior to the filing of this action. "Justice-referred" participant means anyone who attended an ARC pursuant to a court, probation, or parole order or condition requiring them to do so. "Central Territory" includes any location under the control of The Salvation Army, d/b/a Central Territorial of the Salvation Army (and any predecessor corporation) in the 10 years prior to the filing of this action.

252. The Central Territory Walk-In Class and the Central Territory Justice-Referred Class are referred to collectively in this complaint as the "Central Territory Classes."

253. <u>Numerosity</u>: The Classes are so numerous that joinder of all class members is impracticable. Defendant SA National reports that it served over 158,000 individuals in its substance abuse programs in 2019 alone. These class members can be identified based on Defendants' records.

254. <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members, including but not limited to:

    a. Whether Defendant SA Central Territory obtains labor by using serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

    b. Whether Defendant SA Central Territory's practice of threatening to and actually removing members of the ARC workforce who do not work constitutes serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

c.  Whether Defendant SA Central Territory obtains labor by using abuse or threatened abuse of law or legal process in violation of 18 U.S.C. § 1589(a)(3);

d.  Whether Defendant SA Central Territory's practice of threatening to and actually removing members of the justice-referred ARC workforce who do not work constitutes abuse or threatened abuse of law or legal process in violation of 18 U.S.C. § 1589(a)(3);

e.  Whether Defendant SA Central Territory obtains labor by using a scheme, plan, or pattern intended to cause a person to believe that, if they did not perform such labor or services, that person would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

f.  Whether Defendant SA Central Territory's practice of threatening to and actually removing members of the justice-referred ARC workforce constitutes a scheme, plan, or pattern intended to cause the ARC workforce to believe that, if they did not perform such labor or services, that member of the ARC workforce would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

g.  Whether Defendants SA National and SA Central Territory knowingly recruit the ARC workforce for "work therapy;"

h.  Whether Defendants SA National and SA Central Territory knowingly benefit from participation in a venture which obtains labor in violation of the TVPRA while "knowing or in reckless disregard of the fact" that the venture has obtained labor by that means;

i.  Whether Defendants SA National and SA Central Territory knowingly benefit from their violations of the TVPRA;

> j. Whether Defendants SA National and SA Central Territory conspired to violate 18 U.S.C. § 1589;
>
> k. Whether Defendants SA National and SA Central Territory conspired to violate 18 U.S.C. § 1590;
>
> l. Whether Defendants SA National and SA Central Territory attempted to violate 18 U.S.C. § 1589;
>
> m. Whether Defendants SA National and SA Central Territory attempted to violate 18 U.S.C. § 1590;
>
> n. The proper measure of damages; and
>
> o. The proper measure of punitive damages.

255. <u>Typicality</u>: Plaintiffs' claims are typical of the members of the Classes. For example, Plaintiffs, like other putative class members, labored in the ARC program and were subject to the common policies and procedures governing that program. Further, Defendants treated Plaintiffs consistent with other class members, in accordance with their standard policies and practices.

256. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are committed to the prosecution of this action and have retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts among Plaintiffs and the Classes they seek to represent.

257. Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The core

principles governing Defendants' "work therapy" program emanate from national policy and are uniform across the Classes. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

258.     Plaintiffs intend to send notice to all members of the Classes to the extent required by Rule 23(c)(2) of the Federal Rule of Civil Procedure. The names and addresses of the class members are available from Defendants' records and other available sources.

**COUNT ONE**
**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. § 1589(a) – Obtaining Trafficked Labor**
**(On behalf of Plaintiffs and the Central Territory Classes against Defendant SA Central Territory)**

259.     Plaintiffs assert this count on their own behalf and on behalf of the Central Territory Classes.

260.     It is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

261.     The TVPRA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

35

262.     Defendant SA Central Territory obtained the labor of Plaintiffs and members of the Central Territory Classes through threats of serious harm, through a scheme to make Plaintiffs and the Classes believe they would suffer serious harm, and through abuse and threatened abuse of legal process, as alleged above.

263.     Defendant SA Central Territory kept Plaintiffs and members of the Central Territory Classes working under inhumane conditions by preying on their vulnerability, marginalization, and reliance on Defendant for food, clothing, and housing, and by withholding wages that would otherwise allow Plaintiffs and members of the Central Territory Classes to achieve independence from Defendant.

264.     Defendant SA Central Territory kept justice-referred Plaintiffs and justice-referred Central Territory Class members working under inhumane conditions by threatening them with incarceration or other justice system consequences should they fail to perform the required labor.

265.     Defendant SA Central Territory's use of such means to obtain the labor of Plaintiffs and members of the Central Territory Classes was knowing and intentional.

266.     Plaintiffs and members of the Central Territory Classes suffered damages as a result of Defendant SA Central Territory's conduct. Those damages include the value of the labor Plaintiffs and members of the Central Territory Classes provided to Defendant SA Central Territory, as well as emotional distress and other damages.

267.     Plaintiffs and members of the Central Territory Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**COUNT TWO**
**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. § 1589(b) – Benefitting from Trafficked Labor**
**(On behalf of Plaintiffs and the Central Territory Classes against Defendant SA Central**
**Territory, and Plaintiffs Taylor and Lewis, and the Nationwide Classes against Defendant**
**SA National)**

268. Plaintiffs assert this count on their own behalf and on behalf of the Classes.

269. It is a violation of the TVPRA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

270. Defendants SA National and SA Central Territory participated in a venture to obtain labor in violation of the TVPRA because they jointly created and established the policies described herein, by which Defendant SA Central Territory obtained labor in violation of the TVPRA.

271. Defendant SA National and the other Territories participated in a venture to obtain labor in violation of the TVPRA because they jointly created and established the policies described herein, by which the other Territories obtained labor in violation of the TVPRA.

272. Defendant SA Central Territory has knowingly benefited from its participation in the forced labor venture described herein by obtaining labor in its commercial operations without paying market wages.

273. Defendant SA Central Territory has knowingly benefited from its participation in the forced labor venture described herein by obtaining labor without incurring payroll and tax obligations, allowing Defendant SA Central Territory to repurpose funds that would otherwise be used to pay employees to perform these tasks.

274. Defendants SA Central Territory and SA National knowingly benefited from their participation in the ventures described herein because obtaining labor in violation of the TVPRA reduced the number of employees Defendants must recruit from other sources.

275. Defendant SA National derives significant name-recognition benefit from its participation in the ventures described herein, because Defendant SA National advertises The Salvation Army's services at the national level, without distinguishing among services performed in various Territories or with the assistance of related Salvation Army corporations like Defendant SA Central Territory.

276. Defendant SA National further benefits from its participation in the venture described herein because it relies on its name-recognition to obtain significant donations, gifts, and other support.

277. Defendant SA National benefits from its participation in the venture described herein because it empowers Defendant SA National to carry out its programming nationwide, through its Territories and at its strategic direction.

278. Defendants knew or recklessly disregarded the fact that the ventures described herein engaged in obtaining trafficked labor.

279. Plaintiffs and the Classes suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

280. Plaintiffs and the Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT THREE
**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. § 1590(a) – Recruiting Trafficked Labor**
**(On behalf of Plaintiffs and the Central Territory Classes against Defendant SA Central**
**Territory, and Plaintiffs Taylor and Lewis, and the Nationwide Classes against Defendant**
**SA National)**

281.    Plaintiffs bring this count on their own behalf and on behalf of the Classes.

282.    It is a violation of the TVPRA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA.

283.    Defendants knowingly recruited Plaintiffs and Class members in violation of the TVPRA through the means described herein.

284.    Plaintiffs and Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

285.    Plaintiffs and the Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT FOUR
**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. § 1594(b) – Conspiracy to Recruit, Obtain, and Benefit from Trafficked Labor**
**(On behalf of Plaintiffs and the Central Territory Classes against Defendant SA Central**
**Territory, and Plaintiffs Taylor and Lewis, and the Nationwide Classes against Defendant**
**SA National)**

286.    Plaintiffs bring this count on their own behalf and on behalf of the Classes.

287.    It is a violation of the TVPRA to "conspire[] with another" to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA.

288.    It is a violation of the TVPRA to "conspire[] with another" to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means.

289.    Defendant SA Central Territory operated ARC programs in the Central Territory under the structure, framework, and basic requirements designed by Defendant SA National. Defendants SA National and SA Central Territory agreed that Defendant SA Central Territory would operate the ARC programs in the Central Territory. Defendants SA National and SA Central Territory further agreed that the ARC programs in the Central Territory would include "work therapy," as described in this complaint.

290.    The other Territories operated ARC programs in their respective territories under the structure, framework, and basic requirements designed by Defendant SA National. Defendant SA National and these Territories agreed that the Territories would operate the ARC programs in the other Territories. Defendant SA National and these Territories further each agreed that the ARC programs would include "work therapy," as described in this complaint.

291.    Plaintiffs and Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

292.    Plaintiffs and the Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT FIVE
**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. § 1594(a) – Attempted Trafficking**
**(On behalf of Plaintiffs and the Central Territory Classes against Defendant SA Central Territory, and Plaintiffs Taylor and Lewis, and the Nationwide Classes against Defendant SA National)**

293.    Plaintiffs bring this count on their own behalf and on behalf of the Classes.

294.    Attempts to violate the TVPRA are themselves violations of the TVPRA. 18 U.S.C. § 1594(a).

295.    Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590, as described herein.

296.    Plaintiffs and Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

297.    Plaintiffs and the Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Taylor, Lewis, Burkhart, and Page, on behalf of themselves and the Classes, pray for relief as follows:

A.    Determining that this action may proceed as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designating Plaintiffs as representatives for the Classes and designating Plaintiffs' counsel as counsel for the Classes;

C.    Issuing proper notice to the Classes at Defendants' expense;

D.    Leave to add additional plaintiffs and/or state law claims by motion or any other method approved by the Court;

E.    Declaring that Defendant committed violations of the TVPRA;

F.      Awarding damages as provided by the TVPRA, including punitive damages;

G.      Awarding reasonable attorneys' fees and costs as provided by law; and

H.      Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR A JURY TRIAL

Plaintiffs, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demand a trial by jury.

Dated: November 15, 2021

s/ David Fish

**FISH POTTER BOLAÑOS, PC**
David Fish, IL Bar No. 6269745
M. Nieves Bolaños, IL Bar No. 6299128
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel: (312) 224-2423
dfish@fishlawfirm.com
nbolanos@fishlawfirm.com

**NICHOLS KASTER, PLLP**
Anna P. Prakash, MN Bar No. 0351362*
Charles J. O'Meara, MN Bar No. 0402777*
Caroline E. Bressman, MN Bar No. 0400013*
4700 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 256-3200
Fax: (612) 215-6870
aprakash@nka.com
comeara@nka.com
cbressman@nka.com

**NICHOLS KASTER, LLP**
Matthew C. Helland, CA Bar No. 250451*
235 Montgomery St., Suite 810
San Francisco, CA 94104
Tel: (415) 277-7235
Fax: (415) 277-7238
helland@nka.com

**JUSTICE CATALYST LAW**
Lucy B. Bansal, D.C. Bar No. MD06639*
Janet Herold, CA Bar No. 632479*
123 William Street, 16th Floor
New York, NY 10038
Tel: (518) 732-6703
lbansal@justicecatalyst.org
jherold@justicecatalyst.org

**ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE CLASSES**

*pro hac vice applications forthcoming*

43