## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

DARRELL TAYLOR, CHARLES LUCAS,
KEVIN LEWIS, DARRELL BURKHART,
and LEEVERTIS PAGE,
individually and on behalf of
all others similarly situated,                                  Case No. 1:21-cv-06105

        Plaintiffs,

v.

THE SALVATION ARMY                                   **JURY TRIAL DEMANDED**
NATIONAL CORPORATION, and
THE SALVATION ARMY d/b/a
CENTRAL TERRITORIAL OF
THE SALVATION ARMY,

        Defendants.

---

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Darrell Taylor, Charles Lucas, Kevin Lewis, Darrell Burkhart, and Leevertis Page ("Plaintiffs"), by and through their attorneys, Nichols Kaster, PLLP, Justice Catalyst Law, and Fish Potter Bolaños, P.C., on behalf of themselves and the Rule 23 Classes as defined below, bring this Class Action Complaint under the Federal Trafficking Victims Protection Reauthorization Act against The Salvation Army National Corporation ("SA National") and The Salvation Army, d/b/a Central Territorial of the Salvation Army ("SA Central Territory") (collectively "The Salvation Army"). Plaintiffs seek to hold The Salvation Army accountable for profiting from labor it obtained from them and others like them by force and threats of serious harm, including with threats of incarceration, restriction periods which sought to control their communications and movement, abuse of the criminal justice system, and financial coercion and abuse.

1

## INTRODUCTION

1.      Nationwide, The Salvation Army staffs its commercial thrift store operations and other business enterprises by coercing vulnerable Adult Rehabilitation Center ("ARC") program workers and workers in similar programs to perform forced labor under threat of serious harm, abuse of legal process, and a scheme to make workers believe they face the threat of serious harm, such as incarceration, loss of food and housing, reputational harm, and financial harm.

2.      Engaging in a long-standing abuse of the criminal justice system, The Salvation Army secures much of its labor force by soliciting referrals from courts and probation programs, thereby appropriating the coercive power of the state to force workers – who are extremely economically vulnerable – to labor for the benefit of SA National and SA Central Territory.

3.      During the past 10 years, courts and other participants in the criminal justice system have ordered or diverted hundreds or thousands of people, generally with drug or alcohol use disorders, to The Salvation Army's ARCs and similar programs as a condition of probation or parole and/or an alternative to incarceration.

4.      There are over 100 Salvation Army ARCs and similar programs throughout the United States that require work, including Salvation Army's Drug and Alcohol Rehabilitation Programs, Adult Rehabilitation Centers, Adult Rehabilitation Programs, and Corps Salvage and Rehabilitation Centers. In these programs, The Salvation Army forces workers to labor in The Salvation Army's commercial operations as a condition of enrollment. There are anywhere from a handful to hundreds of workers enrolled in each program at any given time.

5.      The Salvation Army holds the ARC program out as "no-cost programs [to] tackle the symptoms and causes of alcohol and drug dependence."[1]

---

[1] https://www.salvationarmyusa.org/usn/rehabilitation/ (last visited on January 19, 2022).

6.      Under the guise of "work therapy" which The Salvation Army asserts and advertises is a form of treatment for drug or alcohol use disorders, The Salvation Army requires its "ARC workforce" – meaning everyone enrolled in the ARC program – to labor long hours in physically demanding jobs that further The Salvation Army's commercial interests. The Salvation Army imposes these requirements in other similar programs.

7.      In exchange for this work, workers receive a "gratuity" of between approximately $1 and $25 per full week of work – equating to pennies an hour for their labor.

8.      The Salvation Army does not afford its ARC workforce the rights that are enjoyed by any of its other employees. Participants who are sent to an ARC through the justice system ("justice-referred") do not have a choice about whether they work. They *must* report to and participate in the ARC program or they risk violating their terms of parole or probation and reincarceration.

9.      The Salvation Army's ARC workforce is not limited to justice-referred workers. The Salvation Army also solicits walk-in workers who, like the justice-referred workers, are largely extremely economically vulnerable.

10.      SA Central Territory exploits these vulnerabilities to coerce the walk-in workforce to perform physically demanding forced labor, often alongside paid employees performing the same work.

11.      Forced labor is a core tenet of The Salvation Army's ARC program. It is not possible to participate in the ARC program – or benefit from the provision of housing, clothing, and food – without performing labor in The Salvation Army's commercial operations.

12.      SA Central Territory does not accept individuals that cannot work. During intake with the potential workforce, individuals are asked whether they are physically able to perform the

forced labor. If they cannot, even if it is because of their age or physical ability, they are not admitted to the program.

13.     SA Central Territory ensures its ARC workforce and workers in other similar programs continue providing labor by threatening serious harm to them should they stop working.

14.     For example, SA Central Territory threatens to report justice-referred workers for violations of their terms of probation or parole ("conditions") if the justice-referred workers fail to complete their required labor in the time and manner dictated by SA Central Territory. Specifically, SA Central Territory is in constant contact with the workers' parole or probation officers and threatens to contact them, or even the sentencing court, to report a violation, i.e., failure to engage in SA Central Territory-mandated labor.

15.     SA Central Territory knows that such a report could result in the worker being incarcerated or otherwise punished by the justice system for allegedly violating their conditions of probation or parole.

16.     The Salvation Army engages in a scheme, plan, or pattern intended to cause its ARC workforce and workers in other similar programs, justice-referred and walk-in alike, to believe that, if they do not perform the required labor, they will suffer serious harm that may include but is not limited to, incarceration, financial instability, food insecurity, homelessness, and the inability to obtain paid work.

17.     For example, The Salvation Army ensures that its ARC workforce will continue providing forced labor through sustained and targeted financial coercion. The Salvation Army's ARC program is designed to make workers fully reliant on the program for food, clothing, and housing.

18.     The Salvation Army generally requires the ARC workforce to live on site, severely restricts their contact with anyone outside of The Salvation Army for the first month to six weeks at the ARC, and limits their ability to work outside paid jobs. The Salvation Army requires many workers to assign and/or sign over their food and other governmental support benefits and/or vouchers, forfeiting their right to decide how to spend them and making them dependent on the program for food and financial support.

19.     By paying workers pennies an hour for their labor and monopolizing their time, The Salvation Army ensures that workers perform work for months before they can save enough money from "gratuities" to provide for their most basic needs for even a few days outside of The Salvation Army.

20.     Similarly, The Salvation Army also ensures that its ARC workforce and workers in other similar programs will continue providing forced labor through sustained and targeted psychological coercion and threats of serious harm.

21.     The Salvation Army is clear about the terms of the exchange the ARC workforce must make: if they want a bed in an ARC facility, they must work full-time for effectively zero wages in The Salvation Army's commercial stores and warehouses, in physically demanding and often dangerous jobs.

22.     The Salvation Army therefore engages in a scheme, plan, or pattern intended to cause its workers to believe that, if they do not perform the required labor, they will suffer serious harm including but not limited to incarceration, financial instability, food insecurity, homelessness, and inability to obtain paid work.

23.     Further, SA Central Territory abuses the criminal justice system by acquiring a steady stream of workers from court and probation referrals and exploiting workers' strict probation or parole conditions to obtain forced labor under the guise of "work therapy."

24.     Through these unlawful acts, The Salvation Army violates the Trafficking Victims Protection Reauthorization Act as outlined in detail below.

## JURISDICTION AND VENUE

25.     This Court has original jurisdiction to hear this Complaint and to adjudicate the claims stated herein pursuant to 28 U.S.C. § 1331 because this action asserts claims arising under federal law, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589 et seq.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

27.     Defendant The Salvation Army National Corporation ("SA National") is a New Jersey corporation headquartered in Virginia and doing business throughout the United States, including in Illinois and in this district.

28.     Defendant The Salvation Army d/b/a Central Territorial of the Salvation Army ("SA Central Territory") is incorporated in Illinois and operates throughout the central United States, including in Illinois.

29.     Plaintiff Darrell Taylor is an adult resident of Illinois.

30.     Plaintiff Charles Lucas is an adult resident of Illinois.

31.     Plaintiff Kevin Lewis is an adult resident of Illinois.

32.     Plaintiff Darrell Burkhart is an adult resident of Michigan.

33.     Plaintiff Leevertis Page is an adult resident of Florida.

## FACTUAL ALLEGATIONS

34.     Plaintiffs re-allege and incorporate by reference the above paragraphs as if fully set forth herein.

### The Salvation Army's Top-Down Organizational Structure Empowers SA National to Direct, Operate, and Benefit from ARC Programs Located in Illinois

35.     The Salvation Army is a worldwide organization. In the United States it exists as a multi-billion-dollar business organized like a military army.

36.     The Salvation Army operates in the United States through SA National and its territory organizations, including SA Central Territory.

37.     The leaders at the top of the organization are called "Commanders." Below Commanders are Officers—both Cadets, who are officers-in-training, and full rank officers (Lieutenant, Captain, Major, Lieutenant Colonel, Colonel, Commissioner). Local adherents who give allegiance to the doctrines and disciplines of The Salvation Army are called Soldiers.

38.     The Salvation Army in the United States is divided into four territories: Eastern, Central, Southern, and Western ("the Territories" or "Salvation Army Territories"). Each Territory is led by a Territorial Commander.

39.     Above the four Territorial Commanders sits the National Commander, the leader of all Salvation Army activities in the United States.

40.     According to The Salvation Army:

The National Commander serves as the official leader of The Salvation Army at National Headquarters in Alexandria, Virginia. National Headquarters acts

primarily as a coordinating body for Salvation Army resources from the corps level on up.[2]

41. Kenneth Hodder is the current National Commander of The Salvation Army.

42. When Commander Hodder accepted his commission, The Salvation Army announced that he would "lead the largest social services organization in the United States, with more than 7,600 centers of operations across the country that together serve 23 million people each year."[3]

43. David Hudson is the recently retired National Commander of The Salvation Army.

44. When he accepted his post as National Commander in 2017, Hudson said he was "honored and privileged to lead The Salvation Army's efforts to help Americans facing a variety of needs, from drug and alcohol rehabilitation to rent and utility assistance to disaster response . . . ."[4]

45. In his role as National Commander, Hudson led "a network of 3,559 officers, 65,469 employees and 3.2 million volunteers serving in more than 7,500 centers of operation throughout the United States."[5]

46. Each of the Salvation Army Territories, including SA Central Territory, must operate at the direction of SA National, subject to SA National's directives, and according to national policies established by SA National.

---

[2] https://s3.amazonaws.com/usn-cache.salvationarmy.org/25328cb3-2dd5-477c-a150-5bdfe657a0da_Fact_Sheet_-_Salvation_Army_Organization_and_Structure.pdf (last visited on November 13, 2021).
[3] *See* https://www.salvationarmyusa.org/usn/story/commissioners-kenneth-and-jolene-hodder-begin-tenure-as-leaders-of-the-salvation-army/ (last visited August 26, 2021).
[4] *See* https://www.salvationarmyusa.org/usn/news/the-salvation-army-appoints-new-national-leaders/ (last visited August 26, 2021).
[5] *Id.*

47.     The Central Territory includes the following states: Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, South Dakota, and Wisconsin.

48.     SA National and SA Central Territory work in concert to carry out the work of The Salvation Army throughout the Central Territory, including in Illinois.

49.     SA National and SA Central Territory work in concert to operate ARC programs in Illinois.

50.     The Eastern, Western, and Southern Territories ("the other Territories") work in concert with SA National to carry out the work of The Salvation Army in the remaining 46 states, regions, and territories: Connecticut, Delaware, Northeast Kentucky, Maine, Massachusetts, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Vermont, Puerto Rico, Virgin Islands, Alaska, Washington, Oregon, California, New Mexico, Arizona, Nevada, Utah, Idaho, Wyoming, Montana, Colorado, Hawaii, Guam, Micronesia, Marshall Islands, Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, Washington, D.C., and West Virginia.

51.     SA National dictates national policy for all Salvation Army Territories.

52.     SA National dictates national policy through, among other means, the Commissioners' Conference.

53.     The Commissioners' Conference is a board that serves as the policy-making body of The Salvation Army in the United States.

54.     The National Commander of SA National presides over the Commissioners' Conference.

55.     Territorial Commanders from each of the four Salvation Army Territories also serve on the Commissioners' Conference and participate in national policy-making.

56. All Territories, including SA Central Territory, operate under the same broad, overall policies, including those dictated by the Commissioners' Conference under the leadership of the National Commander.

57. There is an agreement by and between SA National and SA Central Territory that SA Central Territory will operate under The Salvation Army's policies and procedures, including those implemented by SA National, and will carry out The Salvation Army's programs within the Central Territory, including in Illinois.

58. For example, SA National dictates that ARC workers in Illinois must perform "work therapy," i.e., forced labor, for at least eight hours a day.[6]

59. According to SA National, the "work therapy," (again, in reality, forced labor) requirement is an integral part of the mission of the ARCs.[7]

60. SA National also controls policies and procedures at individual ARCs by requiring that all its ARCs, including ARCs in Illinois, abide by strict confidentiality procedures and protocols governing the collection and protection of workers' personal information.

61. These confidentiality requirements, created and imposed by SA National, directly affected SA Central Territory's interactions with Plaintiffs and other workers in ARC programs in Illinois.

62. SA National participated in the operation of the ARCs in the Central Territory, including in Illinois, by requiring SA Central Territory to comply with its policies, procedures, and practices regarding labor, confidentiality, and other terms and conditions of the ARC program.

---

[6] *See* https://www.salvationarmyusa.org/usn/rehabilitation (last visited January 19, 2022).
[7] *Id.*

63.     By controlling the structure and essential terms and conditions of the ARC program in the Central Territory, including in Illinois, SA National intentionally created a situation in which ARC workers would feel compelled to remain in the program.

64.     By implementing and executing the ARC program nationwide, SA National intentionally created a situation in which ARC workers would feel compelled to remain in the program.

65.     There is an agreement by and between SA National and each of the other Territories that each Territory will operate under The Salvation Army's policies and procedures, including those implemented by SA National, and will carry out The Salvation Army's programs within its respective territory.

66.     The purpose and effect of these agreements is for The Salvation Army to operate as a single, unified, and integrated enterprise throughout the United States.

67.     SA National knowingly benefitted from the forced labor carried out by the ARC workforce and workers in other similar programs in each Territory, including the Central Territory.

68.     SA National knew or should have known that the Territories, including the Central Territory, were using the forced labor of the ARC workforce and workers in other similar programs to operate local Salvation Army stores.

**SA National Hosts Events and Solicits Donations in Illinois**

69.     William Roberts, the National Commander before Hudson, was installed as "USA National Leader" in a ceremony at The Salvation Army's Mayfair Community in Chicago, Illinois.[8]

---

[8] *See* https://www.salvationarmy.org/ihq/news/9526CFF0A589BD64802577E0004AB49F (last visited October 25, 2021).

70. In 2020, SA National, through the Salvation Army National Advisory Board, planned and scheduled a four-day long National Advisory Organizations Conference to be held in Chicago, Illinois.[9]

71. The Salvation Army National Advisory Board is

[a]n organization consisting of prominent leaders from across the country that assists with strategic planning, advocacy, networking, brand positioning, visibility, and high level fund raising for The Salvation Army for issues of significant national interest. It sets the standard for the Army in these areas to advance the ministry of the Army, under the guidance of The Salvation Army National Corporation and the Commissioners' Conference.[10]

72. Although the National Advisory Organizations Conference was cancelled because of the ongoing Covid-19 pandemic, SA National, by and through the National Advisory Board, promulgated a Best Practices handbook for the conference.[11]

73. The handbook contains "best practices" for The Salvation Army's ARCs.[12]

74. SA National advertises The Salvation Army's nationwide programs and services for the purpose of obtaining donations and soliciting workers.

75. SA National advertises using the website www.salvationarmyusa.org. That website is interactive and can be specifically directed at users in particular locations around the country, including in Illinois.

76. For example, users in Illinois can submit donations from this website that will be specifically routed to Illinois by using the "Donate Locally" feature.

---

[9] *See* https://westernusa.salvationarmy.org/advisory_board_west/national-advisory-organizations-conference-2020/ (last visited November 4, 2021).

[10] https://s3.amazonaws.com/usn-cache.salvationarmy.org/070eacd0-ece0-4887-bcc5-fdbe9ae2ec25_Advisory-Board-Manual.pdf, at 36 (last visited November 4, 2021).

[11] *See* https://tsabestpractices.org/document.pdf (last visited November 4, 2021).

[12] *Id*. at 7-11.

77.     Users in the other Territories can similarly submit donations from this website that will be specifically routed to their particular state by using the "Donate Locally" feature.

78.     SA National does not redirect Illinois users to SA Central Territory's website for the purpose of making local (Illinois) donations.

79.     The same is true of users in states within the other Territories.

80.     SA National also solicits the collection of physical donations (clothes, furniture, and other goods) and cash donations specifically earmarked for use in Salvation Army programs in Illinois, including Illinois ARCs, rather than referring those collections to the Central Territory or an Illinois division.

81.     If users in Illinois wish to arrange a donation to an ARC in Illinois, including physical donations that would be picked up by the local ARC workforce, they can do so through SA National's centralized donation websites, https://www.salvationarmyusa.org/usn/, and https://satruck.org/.[13]

82.     SA National engages in extensive advertising regarding its ARCs and other similar programs nationwide, including in Illinois.

---

[13] At the top right corner, select red button labeled "donate locally." A drop-down donation page will appear. On the left-hand side, under "Donate Goods," a visitor to SA National's page can enter any zip code and click "Go." This directs the visitor to a centralized goods donation platform e.g., https://satruck.org/Donate/Choose?zip=%2060604 (Chicago, 60604), where Salvation Army allows the visitor to select what they want to donate and shows Salvation Army's availability for pick-ups and drop offs. Pick-up availability varies based on the zip code the visitor enters. Similarly, if instead of "Donate Goods" the visitor selects "Give Now," Salvation Army allows the visitor to make a monetary donation earmarked for any city in the country, e.g., https://give.salvationarmyusa.org/give/164006/#!/donation/checkout?amount=Other (last visited November 15, 2021).

83.     For example, SA National advertises the ARC program to donors in Illinois including, upon information and belief, through print, television, and internet advertisements, including the website www.salvationarmy.org.

84.     SA National admits that it collects the "locations of devices used to access [its] website."[14]

85.     SA National does this, in part, "[t]o provide, operate, maintain, improve, personalize, and promote [its] services, and donor and volunteer opportunities and activities" and "[t]o solicit volunteer, financial, and other support for [its] mission."[15]

### SA National Oversees Day-to-Day Operations of the Territories

86.     SA National oversees the transportation of donations in the Territories.

87.     For example, employees of SA Central Territory drive Salvation Army trucks throughout the Central Territory, picking up and dropping off donations for Salvation Army thrift stores.

88.     The truck drivers use a phone application that shows the routes of all the Salvation Army trucks picking up and dropping off donations across the country.

89.     Upon information and belief, SA National designed the application that Salvation Army truck drivers use in every Territory to coordinate donation pick-ups and drop-offs.

90.     Upon information and belief, SA National employees visit Salvation Army warehouses and thrift stores in the Central Territory (including in Illinois) and other Territories to supervise and evaluate day-to-day operations.

---

[14] *See* https://www.salvationarmyusa.org/usn/privacypolicy/ (last visited November 9, 2021).
[15] *See Id.*

91.     In conjunction with such visits, SA Central Territory employees told the ARC workforce to be on their best behavior because important people were coming. Upon information and belief, those "important people" were employees, agents, or representatives of SA National who were at the ARCs to supervise and evaluate the ARC program and Salvation Army thrift stores.

92.     Employees from SA National know and are aware that members of the ARC workforce are working in the thrift stores and warehouses when they visit.

93.     Additionally, SA National exercises control over the day-to-day operations of the Territories by promulgating policies and procedures that govern the ARCs and other similar programs nationwide.

94.     SA National, in collaboration with four Territories through the Commissioners' Conference, designed the structure, framework, and basic requirements of The Salvation Army's forced labor program.

95.     For example, upon information and belief, SA National promulgated a "work therapy" handbook that governs and explains the terms of program workers' forced labor for all ARC programs nationwide, including ARC programs in Illinois. The Territories, including SA Central Territory, distribute the handbook to the ARC workforce at registration.

96.     SA Central Territory executes the ARC program and other similar programs at the local level within its territory at the direction of SA National and within the framework of SA National's broad policies and procedures, including in Illinois.

97.     The other Territories execute these programs at the local level within their territories at the direction of SA National and within the framework of SA National's broad policies and procedures.

98. There is an agreement between SA National and the Territories, including SA Central Territory, that each will operate the ARC program and other similar programs in its region under the structure, framework, and basic requirements that SA National has established. This agreement applies to ARCs in Illinois.

99. The purpose and effect of this agreement is that the structure, framework, and basic requirements of the ARC program and other similar programs is the same throughout each Territory, including SA Central Territory.

100. SA National knows the terms, conditions, and structure of the ARC program and other similar programs because it designed the programs and has an ongoing agreement with the Territories to implement them.

101. Without the oversight of SA National, the Territories, including SA Central Territory, could not operate in the same manner across all ARC programs.

**Defendants' Adult Rehabilitation Center Program**

102. SA National and SA Central Territory own, lease, lease to, or operate ARCs, throughout the Central Territory, including in Waukegan, Illinois; Chicago, Illinois; and Detroit, Michigan.

103. The Salvation Army's other Territories also own, lease, lease to, or operate ARCs within the 46 states, regions, and territories in their purview.

104. The ARC program has operated for over 100 years.

105. During the approximately 180-day ARC program, workers are required to rely on The Salvation Army for food, clothing, and shelter.

106.     SA National and SA Central Territory own, lease, lease to, or operate thrift stores throughout the Central Territory, including in Waukegan, Illinois; Chicago, Illinois; and Detroit, Michigan.

107.     The Salvation Army's other Territories also own, lease, lease to, or operate thrift stores within the 46 states, regions, and territories in their purview.

108.     The Territories, including SA Central Territory, each operate ARC programs and thrift stores according to the same framework and broad policies and procedures.

109.     Defendants' ARC programs operate in conjunction with their thrift stores.

110.     SA Central Territory staffs its thrift store operations, in part, with the forced labor of the ARC workforce.

111.     Defendants, and the other Territories, purposefully target and recruit marginalized individuals.

112.     Members of the ARC workforce arrive either as walk-ins, or they are justice-referred, meaning that participating in the program is a requirement of their probation, or the stable housing the ARC provides is a necessity of their parole.

113.     Defendants, and the other Territories, primarily target individuals who: have substance use disorders; are unhoused; are food-insecure; are experiencing poverty; are involved in the justice system; or some combination of the preceding.

114.     The extreme imbalance of power between members of the ARC workforce and The Salvation Army is fundamental to the structure of the program.

115.     Thus, while the Territories, including SA Central Territory, can count on a steady stream of new and capable ARC workers—either diverted from the justice system or left with

nowhere else to go because of poverty or other marginalizing conditions—the majority of the ARC workforce are fully reliant on the ARC program for food, clothing, and housing.

116.     These conditions, which the Territories, including SA Central Territory, exploit, perpetuate, and compel members of the ARC workforce to perform or to continue performing labor to avoid losing access to basic necessities.

117.     Because it is Defendants' policy to pay the ARC workforce almost nothing for their work, the ARC workforce is unable to accrue savings that allow them to survive without the food, clothing, and housing the Territories provide.

118.     "Work therapy" is not a legal term of art or exception to the TVPRA. Rather, it is a description of forced labor performed by individuals who are enrolled in a Salvation Army ARC program operated by any Territory, including SA Central Territory.

119.     Defendants' ARC program, and those run by each of the other Territories, requires that members of the ARC workforce work at least 8 hours per day, and at least 40 hours per week.

120.     SA National is aware of this policy because it emanates from SA National and is executed at the local level by each Territory, including SA Central Territory.

121.     A fundamental tenet of the ARC program is that if you do not work, you may not remain in the ARC facility.

122.     During the ARC intake process, potential workers, both walk-in and justice-referred, are asked whether they can physically do the forced labor required. If they respond that they cannot, even if it is due to their age or physical ability, they are not admitted to the program.

123.     Each Territory, including SA Central Territory, requires members of the ARC workforce to work regardless of their health status.

124. SA National is aware of SA Central Territory's policy requiring ARC workforce to perform work regardless of their health status because SA National created it.

125. Instead of paying legal wages to members of the ARC workforce, each Territory, including SA Central Territory, provides small weekly "gratuities."

126. SA National is aware of the "gratuity" policy because SA National created it.

127. The "gratuity" ranges from approximately $1 to $25 per full week of work, which amounts to between $0.02 and $0.62 per hour.

128. Each Territory, including SA Central Territory, requires members of the ARC workforce to perform strenuous, often dangerous labor, including in its warehouses, kitchens, stores, and on its donation collection trucks.

129. SA Central Territory benefits from the nearly free labor performed by members of the ARC workforce because it reduces SA Central Territory's payroll.

130. In addition to requiring long hours of forced labor, each Territory, including SA Central Territory, often requires that members of the ARC workforce assign their rights and/or sign over their governmental support benefits and/or vouchers, including Supplemental Nutritional Assistance Program (SNAP) and social security disability benefits, to The Salvation Army and forfeit any discretion over how they are spent.

131. At all times, SA Central Territory has control over whether to use governmental support benefits and/or vouchers as one means of leverage to force continued labor and, in fact, frequently does. For example, if potential workers do not have SNAP benefits when they arrive to the ARC facility, SA Central Territory has required them to apply for SNAP benefits as part of the intake process. SA Central Territory then takes the SNAP benefits, and workers do not receive their benefit card until they leave the program.

132. These governmental support benefits and/or vouchers often amount to hundreds of dollars per month, greatly exceeding the "gratuity" the ARC workforce receives each week.

133. Upon information and belief, each Territory, including SA Central Territory, monetizes these governmental support benefits and/or vouchers for its own purposes.

134. Upon information and belief, SA National is aware of the forced assignment of governmental support benefits and/or vouchers.

135. The assignment of governmental support benefits and/or vouchers to The Salvation Army directly impedes the ARC workforce's ability to flee The Salvation Army's ARC facilities – thereby increasing the coercion that renders their labor unlawfully forced.

136. Workers entering the ARC program in SA Central Territory and the other Territories immediately forfeit their personal items including clothing, jewelry, cell phones, electronics, and many prescribed medications.

137. The Territories, including SA Central Territory, cut the ARC workforce off from the outside world for approximately thirty days after arrival at the ARC by, among other things, restricting movement and communication outside the ARC or thrift stores, and restricting or prohibiting access to and contact with outside medical care, family, friends, and/or other visitors.

138. Upon information and belief, the Territories, including SA Central Territory in Illinois, did so in compliance with a nationwide policy promulgated and instituted by SA National.

139. The Territories, including SA Central Territory, then obtain forced labor by threatening to strip the ARC workforce of the food (donated by members of the public or purchased with the ARC workforce's forfeited governmental support benefits and/or vouchers), clothing (donated by members of the public), and housing they have provided if workers do not perform the required labor.

140. Specifically, SA Central Territory employees told the ARC workforce that they would be forced to leave the program if they did not follow the rules, including the forced labor requirement.

141. SA Central Territory employees yelled at the ARC workforce while they were working, telling them to work faster or they would be forced to leave.

142. SA Central Territory employees forced the ARC workforce to work Saturday and Sunday if they broke any of the rules, including not working fast enough.

143. Workers in the ARC program were abruptly kicked out of the program for not following the rules, often with no other place to live.

144. SA Central Territory employees threatened the workers with loss of access to food and shelter if they did not work or follow work instructions.

**Justice-Referred Workers in Defendants' Adult Rehabilitation Center Program**

145. A large proportion of SA Central Territory's ARC workforce is referred to Defendants by court order or as a condition of probation or parole.

146. Defendants rely on justice system referrals for a significant portion of the ARC workforce.

147. SA Central Territory and other Territories benefit from justice system referrals because such referrals reduce the number of employees Defendants and the other Territories must recruit from other sources.

148. SA Central Territory and the other Territories benefit from justice system referrals because SA Central Territory does not pay market rate wages to these employees.

149.     In addition to the conditions faced by the walk-in workforce, justice-referred workers face the threat of incarceration for not complying with SA Central Territory's forced labor program.

150.     Justice-referred members of the ARC workforce are generally required to complete The Salvation Army's 180-day rehabilitation program to satisfy the conditions of release.

151.     Failure to complete the program – including if SA Central Territory expels a member of the ARC workforce from the program for any reason, including refusing to work – may result in incarceration, often for a period longer than 180 days.

152.     This is also true of the ARC workforces in the other Territories.

153.     Defendants, and the other Territories, determine the terms and conditions of the ARC program.

154.     Defendants, and the other Territories, determine the requirements for members of the justice-referred ARC workforce to successfully complete the program.

155.     Because Defendants designed the ARC program, and SA Central Territory and other Territories determine whether a given worker successfully completes the program, the Territories have substantial control over whether members of the justice-referred ARC workforce become incarcerated and/or face other justice system consequences.

156.     Members of the justice-referred ARC workforce are not incarcerated while laboring for SA Central Territory or the other Territories.

157.     Employees of SA Central Territory and the other Territories routinely threaten members of the justice-referred ARC workforce if they do not perform required work, work too slowly, or work below SA Central Territory's standards.

158.     These threats include submitting negative probation reports, calling a worker's probation or parole officer directly to report "misbehavior," calling the police on a worker, and simply kicking the worker out of the ARC, causing the worker to violate the terms of their probation or parole.

159.     Members of the justice-referred ARC workforce were aware of these threats and acts at the ARCs even when the threats and acts were not directed at them personally because they witnessed them or heard about them from others.

160.     The Territories, including SA Central Territory, use threats to obtain or coerce labor from members of the ARC workforce who are on parole or probation but are not required to participate in an ARC program as a stated condition of their parole or probation.

161.     Specifically, SA Central Territory employees were in contact with parole or probation officers for justice-referred ARC workers and reported how those workers were faring.

162.     Both parole or probation officers and SA Central Territory employees reiterated to ARC workers that if they did not follow the rules, including working, they would be kicked out of the program and would likely be incarcerated.

163.     There is often stigma associated with justice involvement.  People who are involved in the justice system often have limited access to resources and advocacy.

164.     SA Central Territory further benefits from justice system referrals because the justice-referred workers have limited access to resources and advocacy which decreases the likelihood that the ARC workforce will refuse to work, demand legal pay, or be able to obtain access to justice to challenge the conditions of their servitude.

165.    The Territories, including SA Central Territory, use the same threats to obtain or coerce labor from members of the walk-in ARC workforce who are on parole or probation but are not required to participate in an ARC program as a stated condition of their parole or probation.

166.    Defendants, and the other Territories, designed the justice-referral aspect of their ARC program to cause members of the justice-referred ARC workforce to believe they will be incarcerated or face other justice system consequences if they do not perform the required labor.

**SA National Knowingly Benefits from Forced Labor**

167.    SA National derives significant name-recognition benefit from services and operations performed within each of its Territories, including the Central Territory, because SA National advertises The Salvation Army's services at the national level, without distinguishing among services performed in various Territories.

168.    SA National relies on its name-recognition to obtain significant donations, gifts, and other support.

169.    SA National's advertising is directed, in part, at securing forced labor.

170.    SA Central Territory also advertises for its programs within the Central Territory, directed, in part, at securing forced labor.

171.    SA Central Territory benefits from the labor performed by the ARC workforce and workers in other similar programs because SA Central Territory does not place such workers on its payroll, and therefore does not pay or submit any form of state or federal payroll taxes for those workers.

172.    The labor performed by the ARC workforce and workers in other similar programs reduces SA Central Territory's payroll and tax obligations and allows SA Central Territory to repurpose funds that would otherwise be used to pay employees to perform these tasks.

173. The exclusion of the ARC workforce and workers in other similar programs from payroll is a national policy emanating from SA National and executed at the local level by each Territory, including SA Central Territory, throughout the Territory and in Illinois.

174. SA National is aware that the Territories exploit and perpetuate the ARC workforce's reliance on the ARC program for food, clothing, and housing.

175. Through the design, policies, procedures, and threats inherent in the ARC program, SA Central Territory intentionally cultivated the ARC workforce's reliance on the ARC for necessities, including food and shelter, resulting in their inability to leave the program.

176. SA National was aware that the justice-referred ARC workforce had to participate in forced labor and could not leave the program without fear of incarceration because SA National designed it that way.

177. Through the design, policies, procedures, and threats inherent in the ARC program and other similar programs, Defendants intentionally created circumstances in which reasonable walk-in and justice-referred participants, because of their shared vulnerable backgrounds, believed they had no choice but to remain laboring.

**Plaintiffs' Forced Labor in Defendants' ARC Program**

*Darrell Taylor*

178. Plaintiff Darrell Taylor ("Taylor") was a justice-referred worker in The Salvation Army's ARC program in Chicago, Illinois from approximately January 2017 until May 2017.

179. Taylor is a class representative for the Nationwide Justice-Referred Class and the SA Central Territory Justice-Referred Class, as defined below.

180. Taylor entered the ARC workforce to comply with aspects of his parole requirements.

181.    SA Central Territory employees knew that Taylor was on parole because his parole officer visited the ARC monthly and SA Central Territory staff communicated with the parole officer directly.

182.    During his intake, SA Central Territory employees told Taylor that he was required to work in order to stay in the ARC program.

183.    SA Central Territory required Taylor to perform difficult and tiring work during his time at the ARC.

184.    Taylor worked on the docks at Salvation Army thrift stores. His work involved loading and unloading trucks of donated items to be sold in the thrift stores and required immense physical effort.

185.    At the direction of SA Central Territory employees, Taylor also went to private homes to pick up donations for the Salvation Army thrift store.

186.    Upon information and belief, a SA Central Territory employee drove Taylor to the private homes in a truck owned or operated by SA Central Territory.

187.    Taylor worked with an SA Central Territory employee to haul donations out of the private homes and into the truck.

188.    An SA Central Territory employee then delivered those donations to Salvation Army thrift store warehouses and stockrooms. The donations were later sold as merchandise in Salvation Army thrift stores.

189.    Taylor worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

190.    The work was grueling, requiring a high degree of physical effort, resulting in fatigue.

191.     SA Central Territory employees told Taylor that he would have to leave the program and go back to jail if he did not comply with the rules, including working.

192.     SA Central Territory gave Taylor a small amount of cash, which employees of SA Central Territory referred to as a "gratuity."

193.     SA Central Territory gave Taylor a "gratuity" of between approximately $5 and $23 per week.

194.     SA Central Territory ensured that Taylor could not build his savings and achieve financial independence by imposing strict requirements on Taylor's time and sharply limiting his freedom of movement and communication.

195.     Through the methods described above, SA Central Territory used Taylor's and other justice-referred workers' vulnerable position as people subject to carceral consequences to threaten serious harm for the purpose of obtaining forced labor.

196.     SA Central Territory successfully forced Taylor to labor for them.

*Charles Lucas*

197.     Plaintiff Charles Lucas ("Lucas") was a justice-referred worker in The Salvation Army's ARC program in Chicago, Illinois in approximately 2017.

198.     Lucas is a class representative for the Nationwide Justice-Referred Class and the SA Central Territory Justice-Referred Class, as defined below.

199.     Lucas entered the ARC workforce to comply with aspects of his parole requirements.

200.     Lucas's parole officer told him that staying at the ARC program was mandatory for at least three months.

201.    During his intake, SA Central Territory employees told Lucas that he was required to work in order to stay in the ARC program.

202.    Lucas's parole officer told him that if he did not work, he would be sent back to jail.

203.    Lucas worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

204.    SA Central Territory required Lucas to perform difficult and tiring work during his time at the ARC.

205.    While in the ARC program, Lucas worked in a Salvation Army warehouse where he separated clothes and other donations that would end up for sale in the Salvation Army thrift store.

206.    The warehouse was dirty and had rats. Lucas did not feel safe there.

207.    The work was grueling, requiring a high degree of physical effort, resulting in fatigue.

208.    SA Central Territory gave Lucas a small amount of cash, which employees of SA Central Territory referred to as a "gratuity."

209.    SA Central Territory gave Lucas a "gratuity" of between approximately $5 and $23 per week.

210.    SA Central Territory ensured that Lucas could not build his savings and achieve financial independence by imposing strict requirements on Lucas's time and sharply limiting his freedom of movement and communication.

211.    Lucas was kicked out of the ARC program for not having a suit jacket to wear in church.

212. Upon information and belief, when Lucas left the ARC, SA Central Territory informed his parole officer, and a warrant was put out for his arrest.

213. Through the methods described above, SA Central Territory used Lucas's and other justice-referred workers' vulnerable position as people subject to carceral consequences to threaten serious harm for the purpose of obtaining forced labor.

214. SA Central Territory successfully forced Lucas to labor for them.

*Kevin Lewis*

215. Plaintiff Kevin Lewis ("Lewis") was a walk-in worker in The Salvation Army's ARC program in Waukegan, Illinois in approximately 2015 and a justice-referred worker in Chicago, Illinois in approximately 2019.

216. Lewis is a class representative for the Nationwide Walk-In Class and the SA Central Territory Walk-In Class, as defined below.

217. When Lewis was a walk-in worker, a SA Central Territory employee told Lewis during the intake process that if he did not work, he could not stay at the ARC.

218. SA Central Territory required Lewis to work in Salvation Army thrift store stockrooms, as a janitor, and on the donation truck during his time at the ARC. Additionally, he was required to shovel snow on the property in the winter.

219. Lewis worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

220. SA Central Territory required Lewis to work at least 40 hours per week to have access to food and shelter.

221. These tasks were physically demanding, requiring a high degree of manual dexterity, resulting in fatigue.

222.     SA Central Territory gave Lewis a small amount of cash each week, which SA Central Territory employees referred to as a "gratuity."

223.     SA Central Territory gave Lewis a "gratuity" of between approximately $7 and $25 per week.

224.     SA Central Territory ensured that Lewis could not build his savings and achieve financial independence by imposing strict requirements on Lewis's time and sharply limiting his freedom of movement and communication.

225.     Lewis saw other walk-in workers lose their access to food and shelter for breaking the rules, including not working in the manner dictated by SA Central Territory.

226.     Through the design, policies, and procedures of the ARC program, SA Central Territory intentionally cultivated Lewis's reliance on the ARC for necessities, including food and shelter.

227.     Through the methods described above, SA Central Territory used Lewis's and other walk-in workers' vulnerable position, including the immediate need for food and shelter, to threaten serious harm for the purpose of obtaining forced labor.

228.     SA Central Territory successfully forced Lewis to labor for them.

***Darrell Burkhart***

229.     Plaintiff Darrell Burkhart ("Burkhart") was a justice-referred worker in The Salvation Army's ARC program in Detroit, Michigan in approximately 2016 and 2017.

230.     Burkhart is a class representative for the SA Central Territory Justice-Referred Class, as defined below.

231.     Burkhart was mandated to stay at the ARC for 12 months as part of his probation.

232. Burkhart understood that he would violate his conditions of release, and risk reincarceration, if he left the ARC at any time before the end of the 12-month period.

233. Burkhart worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

234. Burkhart's work included unloading thrift store donations from private vehicles and hauling the donations into the thrift store to be sold as merchandise. After customers purchased merchandise from the thrift store, Burkhart carried it to their vehicles.

235. Burkhart stocked thrift store shelves with donations that SA Central Territory then sold as merchandise. He also cleaned and maintained thrift stores.

236. The work was grueling, requiring a high degree of physical effort, resulting in fatigue.

237. SA Central Territory gave Burkhart a small amount of cash each week, which employees of SA Central Territory referred to as a "gratuity."

238. SA Central Territory gave Burkhart a "gratuity" of between approximately $2 and $7 per week.

239. SA Central Territory ensured that Burkhart could not build his savings and achieve financial independence by imposing strict requirements on Burkhart's time and sharply limiting his freedom of movement and communication.

240. SA Central Territory used Burkhart's status as a justice-referred worker as a threat to obtain labor.

241. SA Central Territory employees were in regular contact with Burkhart's probation officer, reporting on his behavior and work ethic.

242.     SA Central Territory employees told Burkhart they would report him to his probation officer if he was not working hard or fast enough.

243.     Through the methods described above, SA Central Territory used Burkhart's and other justice-referred workers' vulnerable position as people subject to carceral consequences to threaten serious harm for the purpose of obtaining forced labor.

244.     SA Central Territory successfully forced Burkhart to labor for them.

*Leevertis Page*

245.     Plaintiff Leevertis Page ("Page") was a walk-in worker in The Salvation Army's ARC program in Detroit, Michigan at various times from 1999 until 2017.

246.     Page is a class representative for the SA Central Territory Walk-In Class, as defined below.

247.     During the intake process, Page was told that if he did not work, he could not stay at the ARC.

248.     Page worked at least 8 hours a day, and at least 40 hours a week, for SA Central Territory.

249.     SA Central Territory required Page to work in the ARC kitchen during his time at the ARC.

250.     Page's work included cooking food, cleaning up the kitchen, washing dishes, bussing tables, and emptying trash.

251.     At the direction of SA Central Territory employees, Page catered private events including weddings, funerals, and parties.

252.     SA Central Territory also required Page to perform strenuous work on the docks of a Salvation Army thrift store warehouse during his time at the ARC.

253.     Page's dock work consisted of loading and unloading trucks filled with donations that SA Central Territory sold in the thrift store as merchandise.

254.     The work was grueling, requiring a high degree of physical effort, resulting in fatigue.

255.     SA Central Territory gave Page a small amount of cash each week, which SA Central Territory employees referred to as a "gratuity."

256.     SA Central Territory gave Page a "gratuity" of between approximately $1 and $20 per week.

257.     SA Central Territory ensured that Page could not build his savings and achieve financial independence by imposing strict requirements on Page's time and sharply limiting his freedom of movement and communication.

258.     SA Central Territory employees threatened Page and other walk-in workers with the loss of access to food and shelter if they did not follow work instructions.

259.     Page saw other walk-in workers lose their access to food and shelter for not following SA Central Territory's work instructions.

260.     Through the design, policies, and procedures of the ARC program, SA Central Territory intentionally cultivated Page's reliance on the ARC for necessities, including food and shelter.

261.     Through the methods described above, SA Central Territory used Page's and other walk-in workers' vulnerable position, including the immediate need for food and shelter, to threaten serious harm for the purpose of obtaining forced labor.

262.     SA Central Territory successfully forced Page to labor for them.

## CLASS ACTION ALLEGATIONS

263.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

264.     Plaintiff Lewis asserts his Trafficking Victims Protection Reauthorization Act claims against SA National on behalf of a Nationwide Walk-In Class defined as follows:

> All walk-in workers who performed labor while participating in The Salvation Army's Adult Rehabilitation Center Program ("ARC") or other Salvation Army programs with similar work requirements in the United States within the 10 years prior to the filing of this action, excluding workers who labored in California and the Plaintiffs in *Tolbert, et al. v. The Salvation Army, a Georgia Corporation* (N.D. Ga. filed Nov. 15, 2021). "Walk-in" worker means anyone who participated in an ARC or other Salvation Army program with similar work requirements without a court, probation, or parole order or condition requiring them to do so.

265.     Plaintiffs Taylor and Lucas assert their Trafficking Victims Protection Reauthorization Act claims against SA National on behalf of a Nationwide Justice-Referred Class defined as follows:

> All justice-referred workers who performed labor while participating in The Salvation Army's Adult Rehabilitation Center Program ("ARC") or other Salvation Army programs with similar work requirements in the United States within the 10 years prior to the filing of this action, excluding workers who labored in California and the Plaintiffs in *Tolbert, et al. v. The Salvation Army, a Georgia Corporation* (N.D. Ga. filed Nov. 15, 2021). "Justice-referred" worker means anyone who participated in an ARC or other Salvation Army program with similar work requirements pursuant to a court, probation, or parole order or condition requiring them to do so.

266.     The Nationwide Walk-In Class and the Nationwide Justice-Referred Class are referred to collectively in this complaint as the "Nationwide Classes."

267.     Plaintiffs Lewis and Page bring their Trafficking Victims Protection Reauthorization Act claims against SA Central Territory on behalf of the following Central Territory Walk-In Class:

All walk-in workers who performed labor in The Salvation Army's Adult Rehabilitation Center Program ("ARC") or other Salvation Army programs with similar work requirements in The Salvation Army's Central Territory within the 10 years prior to the filing of this action. "Walk-in" worker means anyone who participated in an ARC or other Salvation Army program with similar work requirements without a court, probation, or parole order or condition requiring them to do so. "Central Territory" includes any location under the control of The Salvation Army, d/b/a Central Territorial of the Salvation Army (and any predecessor corporation) in the 10 years prior to the filing of this action.

268.    Plaintiffs Taylor, Lucas, and Burkhart assert their Trafficking Victims Protection Reauthorization Act claims against SA Central Territory on behalf of a Central Territory Justice-Referred Class defined as follows:

All justice-referred workers who performed labor while participating in The Salvation Army's Adult Rehabilitation Center Program ("ARC") or other Salvation Army programs with similar work requirements in The Salvation Army's Central Territory within the 10 years prior to the filing of this action. "Justice-referred" worker means anyone who participated in an ARC or other Salvation Army program with similar work requirements pursuant to a court, probation, or parole order or condition requiring them to do so. "Central Territory" includes any location under the control of The Salvation Army, d/b/a Central Territorial of the Salvation Army (and any predecessor corporation) in the 10 years prior to the filing of this action.

269.    The Central Territory Walk-In Class and the Central Territory Justice-Referred Class are referred to collectively in this complaint as the "Central Territory Classes."

270.    <u>Numerosity</u>: The Classes are so numerous that joinder of all class members is impracticable. SA National reports that it served over 158,000 individuals in its substance abuse programs in 2019 alone. These class members can be identified based on Defendants' records.

271.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members, including but not limited to:

     a.    Whether SA Central Territory obtains labor by using serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

b. Whether SA Central Territory's practice of threatening to and actually removing members of the ARC workforce, and workers in other similar programs, who do not work constitutes serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

c. Whether SA Central Territory obtains labor by using abuse or threatened abuse of law or legal process in violation of 18 U.S.C. § 1589(a)(3);

d. Whether SA Central Territory's practice of threatening to and actually removing justice-referred workers who do not work constitutes abuse or threatened abuse of law or legal process in violation of 18 U.S.C. § 1589(a)(3);

e. Whether SA Central Territory obtains labor by using a scheme, plan, or pattern intended to cause a person to believe that, if they did not perform such labor or services, that person would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

f. Whether SA Central Territory's practice of threatening to and actually removing justice-referred workers constitutes a scheme, plan, or pattern intended to cause justice-referred workers to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

g. Whether SA National and SA Central Territory knowingly recruit the ARC workforce and workers in other similar programs for forced labor;

h. Whether SA National and SA Central Territory knowingly benefit from participation in a venture which obtains labor in violation of the TVPRA while

"knowing or in reckless disregard of the fact" that the venture has obtained labor by that means;

    i.   Whether SA National and SA Central Territory knowingly benefit from their violations of the TVPRA;

    j.   Whether SA National and SA Central Territory conspired to violate 18 U.S.C. § 1589;

    k.   Whether SA National and SA Central Territory conspired to violate 18 U.S.C. § 1590;

    l.   Whether SA National and SA Central Territory attempted to violate 18 U.S.C. § 1589;

    m.  Whether SA National and SA Central Territory attempted to violate 18 U.S.C. § 1590;

    n.   The proper measure of damages; and

    o.   The proper measure of punitive damages.

272.   <u>Typicality</u>: Plaintiffs' claims are typical of the members of the Classes. For example, Plaintiffs, like other putative class members, labored in the ARC program, and other similar programs, and were subject to the common policies and procedures governing those programs. Further, Defendants treated Plaintiffs consistent with other class members, in accordance with their standard policies and practices.

273.   <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs are committed to the prosecution of this action and have retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts among Plaintiffs and the Classes they seek to represent.

274.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The core principles governing Defendants' forced labor "work therapy" program emanate from national policy and are uniform across the Classes. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Common questions of law and fact also predominate as to Plaintiffs' claim that Defendants attempted to obtain, recruit, and benefit from forced labor in violation of the TVPRA. Defendants employed uniform structures, policies, and procedures in their attempt to obtain, recruit, and benefit from forced labor performed by Plaintiffs and the Classes. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

275.    Plaintiffs intend to send notice to all members of the Classes to the extent required by Rule 23(c)(2) of the Federal Rules of Civil Procedure. The names and addresses of the class members are available from Defendants' records and other available sources.

### COUNT ONE
**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1589(a) and 1595(a) – Obtaining Trafficked Labor**
**(On behalf of Plaintiffs and the Central Territory Classes against SA Central Territory)**

276.    Plaintiffs assert this count on their own behalf and on behalf of the Central Territory Classes.

277.    It is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means

38

of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

278.     The TVPRA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id.* § 1589(c)(2).

279.     SA Central Territory obtained the labor of Plaintiffs and members of the Central Territory Classes through threats of serious harm, through a scheme to make Plaintiffs and the Classes believe they would suffer serious harm, and through abuse and threatened abuse of legal process, as alleged above.

280.     SA Central Territory kept Plaintiffs and members of the Central Territory Classes working under inhumane conditions by preying on their vulnerability, marginalization, and reliance on Defendant for food, clothing, and housing, and by withholding wages that would otherwise allow Plaintiffs and members of the Central Territory Classes to achieve independence from Defendant.

281.     SA Central Territory kept justice-referred Plaintiffs and justice-referred Central Territory Class members working under inhumane conditions by threatening them with incarceration or other justice system consequences should they fail to perform the required labor.

282.     SA Central Territory used the structure, policies, and procedures of the ARC program and other similar programs to obtain the labor of Plaintiffs and members of the Central Territory Classes.

283. SA Central Territory's use of such means to obtain the labor of Plaintiffs and members of the Central Territory Classes was knowing and intentional.

284. Plaintiffs and members of the Central Territory Classes suffered damages as a result of SA Central Territory's conduct. Those damages include the value of the labor Plaintiffs and members of the Central Territory Classes provided to SA Central Territory, as well as emotional distress and other damages.

285. Plaintiffs and members of the Central Territory Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

<strong>COUNT TWO</strong><br>
<strong>Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)</strong><br>
<strong>18 U.S.C. §§ 1589(b) and 1595(a) – Benefitting from Trafficked Labor</strong><br>
<strong>(On behalf of Plaintiffs and the Central Territory Classes against SA Central Territory,</strong><br>
<strong>and Plaintiffs Taylor, Lucas, and Lewis, and the Nationwide Classes against SA National)</strong>

286. Plaintiffs assert this count on their own behalf and on behalf of the Classes.

287. It is a violation of the TVPRA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

288. An individual may bring a civil action against a "perpetrator [] or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation" of the TVPRA. 18 U.S.C. § 1595(a).

289. SA National and SA Central Territory participated in a venture to obtain labor in violation of the TVPRA because they jointly created and established the policies described herein, by which SA Central Territory obtained labor in violation of the TVPRA.

40

290.     SA National and the other Territories participated in a venture to obtain labor in violation of the TVPRA because they jointly created and established the structures, policies, and procedures described herein, by which the other Territories obtained labor in violation of the TVPRA.

291.     SA Central Territory has knowingly benefited from its participation in the forced labor venture described herein by obtaining labor in its commercial operations without paying market wages.

292.     SA Central Territory has knowingly benefited from its participation in the forced labor venture described herein by obtaining labor without incurring payroll and tax obligations, allowing SA Central Territory to repurpose funds that would otherwise be used to pay employees to perform these tasks.

293.     SA Central Territory and SA National knowingly benefited from their participation in the ventures described herein because obtaining labor in violation of the TVPRA reduced the number of employees Defendants must recruit from other sources.

294.     SA National derives significant name-recognition benefit from its participation in the ventures described herein, because SA National advertises The Salvation Army's services at the national level, without distinguishing among services performed in various Territories or with the assistance of related Salvation Army corporations like SA Central Territory.

295.     SA National further benefits from its participation in the venture described herein because it relies on its name-recognition to obtain significant donations, gifts, and other support.

296.     SA National benefits from its participation in the venture described herein because it empowers SA National to carry out its programming nationwide, through its Territories and at its strategic direction.

297.     Defendants knew or recklessly disregarded the fact that the ventures described herein engaged in obtaining trafficked labor.

298.     Plaintiffs and the Classes suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

299.     Plaintiffs and the Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**COUNT THREE**
**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1590(a) and 1595(a) – Recruiting Trafficked Labor**
**(On behalf of Plaintiffs and the Central Territory Classes against SA Central Territory,**
**and Plaintiffs Taylor, Lucas, and Lewis, and the Nationwide Classes against SA National)**

300.     Plaintiffs bring this count on their own behalf and on behalf of the Classes.

301.     It is a violation of the TVPRA to "knowingly recruit[], . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18 U.S.C. § 1590(a).

302.     Defendants knowingly recruited Plaintiffs and Class members in violation of the TVPRA through the means described herein.

303.     Plaintiffs and Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

304.     Plaintiffs and the Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

**COUNT FOUR**

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1594(b) and 1595(a) – Conspiracy to Recruit, Obtain, and Benefit from**
**Trafficked Labor**
**(On behalf of Plaintiffs and the Central Territory Classes against SA Central Territory,**
**and Plaintiffs Taylor, Lucas, and Lewis, and the Nationwide Classes against SA National)**

305.     Plaintiffs bring this count on their own behalf and on behalf of the Classes.

306.     It is a violation of the TVPRA to "conspire[] with another" to "knowingly recruit[],

. . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18

U.S.C. § 1594(b).

307.     It is a violation of the TVPRA to "conspire[] with another" to "knowingly benefit"

from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or

in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C.

§§ 1589(b), 1594(b).

308.     SA Central Territory operated the ARC program and other similar programs in the

Central Territory under the structure, framework, and basic requirements designed by SA National.

SA National and SA Central Territory agreed that SA Central Territory would operate the ARC

program and other similar programs in the Central Territory. SA National and SA Central Territory

further agreed that the ARC program and other similar programs in the Central Territory would

include forced labor "work therapy" requirements as described in this complaint.

309.     The other Territories operated the ARC program and other similar programs in their

respective territories under the structure, framework, and basic requirements designed by SA

National. SA National and these Territories agreed that the Territories would operate the ARC

program and other similar programs in the other Territories. SA National and these Territories

further each agreed that the ARC program and other similar programs would include forced labor

"work therapy" requirements as described in this complaint.

43

310. Plaintiffs and Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

311. Plaintiffs and the Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## COUNT FIVE
**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1594(a) and 1595(a) – Attempted Trafficking**
**(On behalf of Plaintiffs and the Central Territory Classes against SA Central Territory, and Plaintiffs Taylor, Lucas, and Lewis, and the Nationwide Classes against SA National)**

312. Plaintiffs bring this count on their own behalf and on behalf of the Classes.

313. Attempts to violate the TVPRA are themselves violations of the TVPRA. 18 U.S.C. § 1594(a).

314. Defendants attempted to violate 18 U.S.C. §§ 1589 and 1590 by knowingly using the structure, policies, and procedures of the ARC program and other similar programs in an attempt to obtain the labor of Plaintiffs and members of the Classes. Defendants also knowingly participated in a venture in an attempt to recruit, obtain, and benefit from forced labor by jointly creating and establishing the policies described herein.

315. Plaintiffs and Class members suffered damages as a result of Defendants' conduct. Those damages include the value of the labor Plaintiffs and Class members provided to Defendants, as well as emotional distress and other damages.

316. Plaintiffs and the Classes are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with reasonable attorneys' fees and the costs of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Taylor, Lucas, Lewis, Burkhart, and Page, on behalf of themselves and the Classes, pray for relief as follows:

A.   Determining that this action may proceed as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.   Designating Plaintiffs as representatives for the Classes and designating Plaintiffs' counsel as counsel for the Classes;

C.   Issuing proper notice to the Classes at Defendants' expense;

D.   Leave to add additional plaintiffs and/or state law claims by motion or any other method approved by the Court;

E.   Declaring that Defendant committed violations of the TVPRA;

F.   Awarding damages as provided by the TVPRA, including punitive damages;

G.   Awarding reasonable attorneys' fees and costs as provided by law; and

H.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR A JURY TRIAL

Plaintiffs, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demand a trial by jury.

Dated: January 28, 2022

s/ Matthew C. Helland

**FISH POTTER BOLAÑOS, PC**
David Fish, IL Bar No. 6269745
M. Nieves Bolaños, IL Bar No. 6299128
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel: (312) 224-2423
dfish@fishlawfirm.com
nbolanos@fishlawfirm.com

**NICHOLS KASTER, PLLP**
Anna P. Prakash, MN Bar No. 0351362*
Charles J. O'Meara, MN Bar No. 0402777*
Caroline E. Bressman, MN Bar No. 0400013*
4700 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Tel: (612) 256-3200
Fax: (612) 215-6870
aprakash@nka.com
comeara@nka.com
cbressman@nka.com

**NICHOLS KASTER, LLP**
Matthew C. Helland, CA Bar No. 250451*
235 Montgomery St., Suite 810
San Francisco, CA 94104
Tel: (415) 277-7235
Fax: (415) 277-7238
helland@nka.com

**JUSTICE CATALYST LAW**
Mariyam Hussain, IL Bar No. 6304816
Lucy B. Bansal, D.C. Bar No. MD06639*
Janet Herold, CA Bar No. 632479*
123 William Street, 16th Floor
New York, NY 10038
Tel: (518) 732-6703
mhussain@justicecatalyst.org
lbansal@justicecatalyst.org
jherold@justicecatalyst.org

**ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE CLASSES**

*admitted pro hac vice*